1   Robert J. Nelson (State Bar No. 132797)
    Steve Swerdlow (State Bar No. 250344)
2   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    Embarcadero Center West
3   275 Battery Street, 30th Floor
    San Francisco, CA  94111-3339
4   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
5

6   David M. Birka-White (State Bar No. 85721)
    BIRKA-WHITE LAW OFFICES
    411 Hartz Avenue, Suite 200
7   Danville, CA  94526
    Telephone:  (415) 616-9999
8   Facsimile:  (415) 616-9494

9   *Attorneys for Plaintiffs Lynda and Lloyd Cartwright*

10

11                    **UNITED STATES DISTRICT COURT**

12                  **EASTERN DISTRICT OF CALIFORNIA**

13                       **SACRAMENTO DIVISION**

14

15   LYNDA CARTWRIGHT and LLOYD          Case No.  2:07-cv-2159-FCD-EFB
16   CARTWRIGHT, on behalf of themselves
     and all others similarly situated,
17                                        **PLAINTIFFS' MEMORANDUM OF**
                    Plaintiffs,           **POINTS AND AUTHORITIES IN**
18                                        **SUPPORT OF MOTION FOR CLASS**
     v.                                   **CERTIFICATION**
19
     VIKING INDUSTRIES, INC., an Oregon
20   Corporation, and DOES 1-100, inclusive,   Date:        August 7, 2009
                                               Time:        10:00 a.m.
21                   Defendants.               Courtroom:  2
                                               Honorable Frank C. Damrell, Jr.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................ 1

II.    PARALLEL CLASS ACTION IN CALIFORNIA STATE COURT ................... 2

III.   STATEMENT OF FACTS ............................................................................. 2

   A.   Parties ................................................................................................. 2

   B.   The Product Defect ............................................................................. 3

   C.   The Viking Warranty ........................................................................... 5

   D.   The Defense Testing ........................................................................... 6

   E.   Uniformity of the Defect ...................................................................... 7

IV.    LEGAL ARGUMENT .................................................................................... 7

   A.   Consumer Fraud and Defect Cases Are Particularly Appropriate for
        Certification ......................................................................................... 8

   B.   The Proposed Class Satisfies Rule 23. ............................................... 9

        1.   The Legal Standard ...................................................................... 9

        2.   Plaintiffs Satisfy The Four Requirements Of Rule 23(A) ............. 9

             a.   The Members Of The Proposed Class Are So
                  Numerous That Joinder Is Impracticable. ........................ 10

             b.   This Case Presents Common Questions of Law and
                  Fact. ................................................................................. 10

             c.   The Claims of the Representative Plaintiffs Are
                  Typical of the Claims of All Class Members. .................... 12

             d.   The Representative Plaintiffs Will Fairly and
                  Adequately Protect the Interests of the Class. ................. 14

        3.   Plaintiffs Satisfy the Requirements of Rule 23(b)(3) .................. 15

             a.   Common questions of law and fact predominate over
                  individual issues. .............................................................. 15

             b.   A class action is the superior method for the fair and
                  efficient adjudication of this controversy ........................ 19

                  i.    The interest of individual class members in
                        controlling the litigation. ........................................ 19

                  ii.   The extent and nature of litigation already
                        commenced by the class. ........................................ 20

                  iii.  The desirability of concentrating the
                        litigation in a given form. ....................................... 20

                  iv.   The case is manageable as a class action. ............. 20

V.     CONCLUSION ............................................................................................ 20

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

5

*Alberto v. GMRI, Inc.*
   252 F.R.D. 652 (E.D. Cal. 2008) .......................................................... 13

6

*Amchem Prods., Inc. v. Windsor*
   521 U.S. 591 (1997) ................................................................... 8, 15

7

8

*America Online v. Superior Court*
   90 Cal. App. 4th 1 (2001) ................................................................ 9

9

*Armstrong v. Davis*
   275 F.3d 849 (9th Cir. 2001)....................................................... 11, 12, 13

10

11

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*
   191 Cal.App.3d 1341 (1987)............................................................ 18, 19

12

*Blackie v. Barrack*
   524 F.2d 891 (9th Cir. 1975)........................................................... 11, 15

13

14

*Bower v. Bunker Hill Co.*
   114 F.R.D. 587 (E.D. Wash. 1986)........................................................ 9

15

*Campbell v. General Motors Corp.*
   32 Cal.3d 112 n.6 (1982) ............................................................... 17

16

17

*Chamberlan v. Ford Motor Co.*
   223 F.R.D. 524 (N.D. Cal. 2004)................................................. 10, 13, 14, 16

18

19

*Chamberlan v. Ford Motor Co.*
   402 F.3d 952 (9th Cir. 2005)
   *aff'g* 223 F.R.D. 524 (N.D. Cal. 2004) ........................................ 8, 10, 13, 16

20

*Deist v. Viking Industries, Inc.,*
   Case No. CV025771 (San Joaquin Sup. Ct.) ................................................ 2

21

22

*Diest v. Viking Industries, Inc.*
   Case No. CV025771 ..................................................................... 20

23

*E.E.O.C. v. Gen. Tel. Co. of Northwest, Inc.*
   599 F.2d 322 (9th Cir. 1979)............................................................ 9

24

25

*Eisen v. Carlisle & Jacquelin*
   417 U.S. 156 (1974).................................................................... 9

26

*Fernandez v. Dep't of Soc. and Health Servs.,*
   232 F.R.D. 642 (E.D. Wash. 2005)....................................................... 13

27

28

*Gartin v. S & M Nutec, LLC*
   245 F.R.D. 429 (C.D. Cal. 2007) ....................................................... 16

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3  *Grays Harbor Adventist Christian School v. Carrier Corp.*
     242 F.R.D. 568 (W.D. Wash. 2007) ...................................................................... 8, 16

4

   *Gulf Oil Co. v. Bernard*
5     452 U.S. 89 (1981) ............................................................................................ 7

6  *Hanlon v. Chrysler Corp.*
     150 F.3d 1011 (9th Cir. 1998) ....................................................................... 10, 14, 15

7

   *Hanon v. Dataproducts Corp.*
8     976 F.2d 497 (9th Cir. 1992) ............................................................................. 13

9  *Hansen v. Ticket Track, Inc.*,
     213 F.R.D. 415 (W.D. Wash. 2003) .................................................................... 13

10

   *Harris v. Palm Springs Alpine Estates, Inc.*
11    329 F.2d 909 (9th Cir. 1964) .............................................................................. 10

12 *Hewlett Packard v. Superior Court*
     167 Cal. App. 4th 87 (2008) ............................................................................... 9

13

   *Hicks et al. v. Kaufman & Broad Home Corp., et al.*,
14    89 Cal.App.4th 908 (2001) ................................................................................ 17

15 *In re Badger Mountain Irr. Dist. Secs. Litig.*
     143 F.R.D. 693 (W.D. Wash. 1992) .................................................................... 10

16

   *Jordan v. County of Los Angeles*
17    669 F.2d 1311 (9th Cir. 1982)
     *vacated on other grounds*
18    459 U.S. 810 (1982) .......................................................................................... 13

19 *Jordan v. Los Angeles County*
     669 F.2d 1311 n.10 (9th Cir. 1980)
20   *opinion amended*
     726 F.2d 1366 (9th Cir. 1984) ............................................................................ 10

21

   *Kincaid v. City of Fresno*
22    244 F.R.D. 597 (E.D. Cal. 2007) ..................................................................... 11, 13

23 *La Sala v. American Savs. & Loan Ass'n.*
     5 Cal.3d 864 (1971) .......................................................................................... 9

24

25 *Mazza v. American Honda Motor Co.*
     254 F.R.D. 610 (C.D. Cal. 2008) ................................................................. 8, 10, 19

26 *Mortimore v. Fed. Deposit Ins. Corp.*
     197 F.R.D. 432 (W.D. Wash. 2000) .................................................................... 13

27

   *Negrete v. Allianz Life Ins. Co. of N. America*
28    238 F.R.D. 482 (C.D. Cal. 2006) ........................................................................ 10

# TABLE OF AUTHORITIES
### (continued)

Page

*Perez-Funez v. District Director*
  611 F. Supp. 990 (C.D. Cal. 1984) ........................................................................ 10

*Smith v. Marilyn M. Fishing, Inc.*
  173 Cal.App.3d 453 (1985)................................................................................... 17

*State of California v. Levi Strauss & Co.*
  41 Cal.3d 460 (1986) ............................................................................................. 9

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003)........................................................................... 11, 14

*Valentino v. Carter-Wallace, Inc.*
  97 F.3d 1227 (9th Cir. 1996)................................................................................ 19

*Vasquez v. Superior Court*
  4 Cal.3d 800 (1971) ........................................................................................... 9, 16

*Westways World Travel, Inc. v. AMR Corp.*
  218 F.R.D. 223 (C.D. Cal. 2003) ......................................................................... 10

*Wiener v. Dannon Co., Inc.*
  255 F.R.D. 658 (C.D. Cal. 2009) .................................................................... 15, 16

## STATUTES

Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C.App. p. 697 ......................... 8

Consumer Legal Remedies Act and Business and Professional Code
  Section 17200 and 17500.................................................................................... 20

## RULES

Fed. R. Civ. Proc.
  23.......................................................................................................................... 9

Fed. R. Civ. Proc.
  23(a) ..................................................................................................................... 9

Fed. R. Civ. Proc.
  23(a)(1) .............................................................................................................. 10

Fed. R. Civ. Proc.
  23(a)(3) .............................................................................................................. 12

Fed. R. Civ. Proc.
  23(a)(4) .............................................................................................................. 14

Fed. R. Civ. Proc.
  23(b)(3) ........................................................................................................ 15, 19

# TABLE OF AUTHORITIES
### (continued)

Page

## TREATISES

1 *Newberg on Class Actions* (4th ed. 2002 and 2008 Supplement)
   § 3.10.................................................................................................................. 10

1 *Newberg on Class Actions* (4th ed. 2002 and 2008 Supplement)
   § 3:5.................................................................................................................... 10

3 *Newberg on Class Actions* (4th ed. 2002 and 2008 Supplement)
   § 10:01................................................................................................................ 18

3 *Newberg on Class Actions* (4th ed. 2002 and 2008 Supplement)
   § 10:2.................................................................................................................. 19

7A Charles A. Wright, *et al., Federal Practice and Procedure* (3d ed. 2005)
   § 1751................................................................................................................... 7

– v –

1

## I.      INTRODUCTION

2

Plaintiffs allege that Viking Series 3000 windows are inherently defective products

3

manufactured, marketed and sold by defendants Viking Industries with a "lifetime" warranty.  As

4

a result, approximately 50,000 California homeowners have defective windows that have failed or

5

inevitably will fail well before the expected useful life of the product.

6

Viking manufactured approximately one million Viking Series 3000 windows

7

from 1991-1999.  The Viking Series 3000 windows consist of three types of windows:  the single

8

hung, the horizontal slider, and the fixed window.  All of the windows within each of the three

9

types were manufactured in the identical way, using the same aluminum frames and the same

10

sealant throughout their production.  Viking selected the wrong sealant and then failed to properly

11

apply it when manufacturing the windows.  The watertight integrity of the Viking window

12

aluminum frames depends entirely on sealant.  The sealant is failing and will continue to fail.

13

This inherent design defect is common to all Viking 3000 windows, and is responsible for the

14

window leaks at issue.

15

Viking provided "lifetime warranties" on all Series 3000 windows beginning in

16

March, 1991.  Viking represented that the windows were "free from defects of material and

17

workmanship", neither of which is true.  Plaintiffs have alleged that Viking learned of these

18

defects early on in production and concealed the fact of the defects throughout a substantial

19

portion of the class period, 1991-1999.

20

Prosecution of this action as a class action is the most appropriate – and the only

21

realistic – means for equitably redressing the damages suffered by approximately 50,000 class

22

members.  Viking Series 3000 windows fail for reasons common to the Class and have caused

23

damages that may be determined by formulaic proof or through an administrative claims process.

24

Resolving the common issues in a single action is the most appropriate and efficient vehicle for

25

adjudicating these claims.

26

By contrast, if this action does not proceed as a class action, most of the proposed

27

class members will be unable to pursue their claims.  The expense of developing, preparing and

28

presenting the scientific proof required to establish individual claims puts prosecution of this case

1  beyond the economic reach of virtually all class members.  Even if a class member could afford

2  individual litigation, the cost of prosecuting such a claim would far exceed the amount of damage

3  suffered by any individual homeowner.

4     For these reasons, and as further set forth below, Plaintiffs respectfully request that

5  this Court enter an Order granting class certification.

6  **II. PARALLEL CLASS ACTION IN CALIFORNIA STATE COURT**

7     On April 9, 2009, in Case No. CV 025771, the Honorable Carter Holly of the

8  Superior Court of California, County of San Joaquin, Stockton Division, certified a litigation

9  class in express and implied warranty for the same products at issue in this lawsuit, the Viking

10  Series 3000 windows.  *See Deist v. Viking Industries, Inc.*, Case No. CV025771 (San Joaquin

11  Sup. Ct.).  The present *Cartwright* case includes the same express and implied warranty causes of

12  action on behalf of original owners of property with the defective windows who still own the

13  property in question, but also alleges additional causes of action for negligence, strict liability,

14  violation of Civil Code, Section 1770 (Consumers Legal Remedies Act), violation of Business

15  and Professional Code Sections 17200 and 17500 (Unfair Competition Law), fraudulent

16  concealment and restitution.  As a result, the proposed Class in *Cartwright* includes not just

17  original owners who remain current owners but also all current owners, as well as original owners

18  who are now former owners.  Only about 20 percent of the *Deist* and *Cartwright* classes are

19  overlapping, *i.e.*, the original and still current owners who have warranty claims.

20     Plaintiffs request that this Court take judicial notice of the State Court Order in

21  *Deist v. Viking* granting class certification for express and implied warranty. (*See* accompanying

22  Request for Judicial Notice.)

23  **III. STATEMENT OF FACTS**

24    **A. Parties**

25     Plaintiffs:  Lynda Cartwright and Lloyd Cartwright reside at 553 Apollo Court,

26  Vallejo, California (Cartwright Decl., ¶2.)

27     Defendant:  Viking Series 3000 windows were manufactured by Viking Industries,

28  Inc. ("Viking") and sold the Series 3000 windows from 1991-1999.

1

<u>The Class</u>:  The Class is defined as:

2

3

4

5

6

7

All current and past owners of residential property in California in which Viking Series 3000 windows manufactured by Viking Industries Inc. between approximately March 1, 1991 and 1999 (the "Class Period") are or have been installed.  The proposed class includes property owners who have replaced their Viking windows. Excluded from the Plaintiff Class are the Defendant, any entity in which Defendant has a controlling interest, and their legal representatives, heirs and successors, and any judge to whom this case is assigned, and any member of the judge's immediate family. Claims for personal injury are excluded from the claims of the Plaintiff Class which are alleged herein.

8

**Warranty Subclass:**

9

10

11

12

13

14

15

16

All original owners of residential property in California who are the first occupant resident owner in which Viking Series 3000 windows manufactured by Viking Industries Inc. between approximately March 1, 1991 and 1999 (the "Class Period") are or have been installed.  The proposed class includes property owners who have replaced their Viking windows. Excluded from the class are named Plaintiffs in pending lawsuits against Viking Industries, Inc. relating to Series 3000 windows other than in *Cartwright v. Viking*; also excluded is the Defendant, any entity in which the Defendant has a controlling interest, and their legal representatives, heirs and successors, and any judge to whom this case is assigned, and any member of the judge's immediate family.  Claims for personal injury are excluded from the claims of the Plaintiff Class which are alleged herein.

17

Viking sold approximately one million windows during the class period.  Since an

18

average residence utilizes approximately 20 windows (Cassell Decl. ¶41), these figures indicate

19

that Viking windows were installed in approximately 50,000 residential units during the Class

20

Period, the vast majority of which were in California.

21

**B.   <u>The Product Defect</u>**

22

Windows in residential buildings must be watertight.  Viking Industries, Inc.

23

placed a sticker on all Series 3000 windows asserting that the windows met the R-20 certification.

24

The R-20 certification constitutes a representation to  consumers, building professionals and

25

trades that the windows meet American Architectural Manufacturers' Association ("AAMA")

26

standards and that the windows are watertight.  In fact, the Viking Series 3000 windows neither

27

meet the "R-20" certification nor are they watertight. (Cassell Decl. ¶41)

28

The Viking windows consist of four aluminum frame members:  the bottom (sill),

1   two sides (jambs), and the top (head).  The two lower corners of each window are the most

2   critical because they must be watertight or wind driven rain will enter the building.  (See Cassell

3   Declaration, Exhibit A, including an isometric drawing of the Viking window corner.)

4           In the absence of sealant, the jamb to sill intersections, *i.e.*, the lower corners of

5   the windows, are not watertight.  (Chamsi Decl. ¶¶21, 25, Cassell Decl. ¶¶25, 26).  These facts

6   are undisputed by Viking's defense experts and representatives (*See* Birka-White Declaration,

7   Exhibit C, Deposition of Peter Cruz ("Cruz Depo."), 13:13-25, 14:1-16, 25:6-15; and Birka-White

8   Declaration, Exhibit D, Deposition of Troy Farr, 57:9-22, 58:1-4, 58:22-25, 59:1-4.)

9           Because Viking chose the wrong sealant, PTI-200, the Series 3000 windows have

10  at least three separate inherent defects.  First, the life expectancy of the aluminum window is 35-

11  40 years.  (Chamsi Decl. ¶32, Cassell Decl. ¶33).  In contrast, the life expectancy of the sealant is

12  10-15 years.  (Chamsi Decl. ¶ 33; Cassell Decl. ¶33).  The difference of the life expectancies

13  between the framing members and the sealant is irreconcilable and inconsistent with Viking's

14  design intent.  (Birka-White Declaration, Exhibit C, Cruz Depo., 46:3-8, 17-23, Chamsi Decl.

15  ¶31).  The sealant has or will fail before the useful life of the windows  and is an inherent design

16  defect in every Viking Series 3000 window. (Chamsi Decl. ¶¶22, 38).

17          Second, Viking universally failed to follow its own specifications regarding where

18  to apply the sealant to the lower corners. (Cassell Decl. ¶27, Chamsi Decl. ¶35).  All jamb to sill

19  intersections are attached by two screws. (Cassell Decl. ¶26).  Although connected, these

20  intersections are not watertight. (Cassell Decl. ¶26)  Where the two framing members intersect,

21  there are five seams which must be sealed. (Cassell Decl. ¶27; Cassell Decl., Exhibit B).

22  Contrary to its own specifications, however, Viking sealed only three of the five seams. (Cassell

23  Decl. ¶¶27, 28;  Chamsi Decl. ¶35).  This inherent defect is universally common to all Viking

24  Series 3000 manufactured during the Class Period and has or will cause the windows to leak

25  before their useful life. (Cassell Decl. ¶¶27, 28).

26          Third, the PTI-200 sealant is a liquid sealant designed for use on horizontal seams,

27  seams parallel to the bottom of the window.  Each window corner has two vertical seams where

28  the jamb intersects the sill at each lower corner.  (Chasmi Decl. ¶34, Cassell Decl. ¶23,

1   Exhibit A).  These seams must be sealed to create a watertight joint.  The PTI-200 sealant is not

2   designed to be used in vertical seams. The sealant sags and cannot be properly applied to the

3   vertical seam.  (Chamsi Decl. ¶34).  This, too, is an inherent defect common to all Viking Series

4   3000 windows in the Class Period.

5          Lastly, a substantial portion of the Viking windows have missing or misapplied

6   sealant on the three seams to which they did apply the PTI 200.  (Cassell Decl. ¶¶ 31, 33; Chamsi

7   Decl. ¶35).

8          These design and manufacturing defects cause the Series 3000 windows to leak

9   before their useful life.  (Chamsi Decl. ¶35).

10          **C.**     **The Viking Warranty**

11          Upon launching the Viking Series 3000 in 1989, Viking offered a one-year

12   warranty on the 3000 Series products.  (Keegan Decl. ¶17).  In March, 1991, however, Viking

13   amended the 3000 Series warranty, offering a "Lifetime Warranty" that claimed that the 3000

14   Series products would be "free from defects in material and workmanship . . .."  (Keegan Decl.

15   ¶18).  Despite the significant lengthening of the 3000 Series warranty, Viking neither (1) made

16   adjustments to its product designs to increase the durability of its product, nor (2) conducted

17   engineering-based testing to determine whether the 3000 Series products were of sufficient

18   quality to merit the new Lifetime Warranty.  (Keegan Decl. ¶19).  The decision to vastly expand

19   the warranty coverage for this product appears to have been for marketing purposes and not as the

20   result of product improvements, and, as such, was an inappropriate and misleading business

21   decision.  (Keegan Decl. ¶19).

22          Viking consistently and prominently advertised the Lifetime Warranty on the 3000

23   Series products and in marketing materials for the 3000 Series. (Keegan Decl. ¶20).  The Viking

24   warranty provided as follows:

25          "Viking Industries, Inc., warrants that its Viking windows and
           doors will be free of defects in material and workmanship that
26          significantly impairs their operation and proper usage and applies
           for as long as you own them."

27

28          Viking also affixed a large 8" x 10" sticker label on each window that stated

"LIFETIME WARRANTY".  The "LIFETIME WARRANTY" language faced the front of the window.  The backside of the label stated " The window is warranted to be free from defects in material and workmanship" for as long as you own them.  (*See* Birka-White Decl., Exhibits F and G).

These express warranties form a part of the basis of the bargain between Viking and the proposed Class members, as they were inducements for the purchase of the windows.[1]  A customer is expected to perceive greater value and less risk when considering a product with a lifetime warranty as compared to a product with a warranty lasting only several years or a product with no warranty at all.  (Keegan Decl. ¶27).  Warranties are a tool used by marketers to gain an edge on competitors who are not offering warranties on similar products, or to establish an equal footing in the marketplace with competitors who are offering similar warranties.  (Keegan Decl. ¶29).  For all of these reasons, warranties have a significant effect on customer purchase decisions.  Accordingly, sellers have a responsibility to ensure that the warranty provisions offered are in line with the expected quality of the product being sold. (Keegan Decl. ¶31).

Viking knew or should have known of the irreconcilable difference between the long term life expectancy of the Viking aluminum frame and the relatively short term life expectancy of the sealant.  Viking knew or should have known that the sealant and the window would fail prematurely, but marketed the "Lifetime Warranty" notwithstanding.

### D.     The Defense Testing

Defendant's experts subjected 68 randomly selected homes to water testing.  Approximately 43% of these purportedly randomly selected windows, 29 out of 68, *failed* the water test.  In every case of failure, the windows leaked at the lower corners.  (*See* Birka-White Declaration, Exhibit E, Deposition of Joel Wolf, 30:20-25).

Significantly, the testing methodology employed by Defendant's experts did not conform to the criteria of either the American Society for Testing and Materials ("ASTM") or the AAMA, the industry recognized promulgators of standards relating to the field testing of

---

[1] The written warranty used by Viking during the Class Period is attached to the Birka-White Declaration, ¶17 (Exhibit F) and ¶18 (Exhibit G).

1  windows.  The defense experts intentionally deleted the essential "pressure chamber" component

2  of the "spray rack" test.  (Chamsi Decl. ¶¶28, 29, Cassell Decl. ¶37).  The standard

3  unambiguously requires use of the "pressure chamber," which is specifically designed to mirror

4  wind driven rain and, when included, is far more rigorous than the "spray rack" test by itself.

5  Had these tests been properly performed, an even higher percentage of windows would have

6  failed the test.  (Chamsi Decl. ¶29, Cassell Decl. ¶38).

7          The defense experts have consistently asserted that the "spray rack" test subjects

8  the windows to an excessive volume of water, and  as a result, a failure does not reflect real life

9  conditions.  This assertion is incorrect.  Each of the windows that failed the "spray rack test" were

10 resealed by these same defense experts at the lower corners of the windows and then retested.  In

11 virtually every case in which the windows were resealed and retested, the windows did not leak.

12 (Cassell Decl. ¶35, Birka-White Decl., Exhibit E, Deposition of Joel Wolf, 37:25, 38:1-19).  This

13 proves not only that the "spray rack test" did not subject the windows to excessive water, but also

14 proves that the Viking windows were improperly sealed in the first instance.

15         **E.      Uniformity of the Defect**

16         The scientific evidence developed both by Plaintiffs' and Defendant's experts

17 demonstrate that the design flaws in the Viking Series 3000 windows  are so fundamental that

18 failure of the windows  is inevitable.  The nature of the failures are unique to the design and

19 manufacture of the windows.  The failure mechanisms are common to all Viking Series 3000

20 windows, and present uniform factual and legal issues for resolution in this case.

21 **IV.    LEGAL ARGUMENT**

22         The class action device allows large numbers of claims involving the same core

23 issues to proceed in the aggregate, providing a path to relief where otherwise there is none.  "Class

24 actions serve an important function in our system of civil justice."  *Gulf Oil Co. v. Bernard*, 452

25 U.S. 89, 99 (1981); *see generally* 7A Charles A. Wright, *et al., Federal Practice and Procedure*

26 § 1751 (3d ed. 2005).  This case – a consumer fraud and product failure case that arises from the

27 manufacture and concealment of a defective product – is exactly that type of case, as the losses

28 typically are too small to justify the expense of hiring counsel and the requisite experts necessary

1   to prove liability

2         **A.**      **Consumer Fraud and Defect Cases Are Particularly Appropriate for**
                    **Certification**

3

4             Consumer cases like this one, which arise from a single course of conduct that

5   affects large numbers of consumers who purchase a product or service, are particularly amenable

6   to class treatment. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); Advisory

7   Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C.App. p. 697.  Cases involving

8   concealment of a product defect are often negative-value cases, that is, the cost to litigate an

9   individual case exceeds the expected return for an individual plaintiff.  When these cases proceed

10   as a class, economies of scale allow the aggregated cases to go forward in an efficient manner and

11   litigation costs no longer exceed the expected return.  Class actions are often the only means of

12   access to the legal system when the defendant's conduct causes injury to many consumers, but on

13   a small scale. *Id.* at 617.  The *Amchem* Court explained:

14           The Advisory Committee had dominantly in mind vindication of
        'the rights of groups of people who individually would be without

15           effective strength to bring their opponents into court at all.'
        Kaplan, Prefatory Note 497.  As concisely recalled in a recent

16           Seventh Circuit opinion:  "The policy at the very core of the class
        action mechanism is to overcome the problem that small recoveries

17           do not provide the incentive for any individual to bring a solo
        action prosecuting his or her rights. *Maced v. Van Ru Credit Corp.*,

18           109 F.3d 338, 344 (1997).

19   *Amchem*, 521 U.S. at 617.

20             Courts in the Ninth Circuit have certified numerous cases involving claims like

21   those brought here. *See, e.g., Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005)

22   *aff'g* 223 F.R.D. 524 (N.D. Cal. 2004) (class certification involving concealed defect in plastic

23   manifolds installed on motor vehicles); *Mazza v. American Honda Motor Co.*, 254 F.R.D. 610,

24   615 (C.D. Cal. 2008) (certification of CLRA and UCL claims in case involving failure to disclose

25   failure of braking system); *Grays Harbor Adventist Christian School v. Carrier Corp.*, 242

26   F.R.D. 568, 574 (W.D. Wash. 2007) (certifying warranty and consumer fraud claims in case

27   involving defective furnaces).  California state courts also regularly certify classes in consumer

28   cases.  Recognizing the "importance [of] class action consumer litigation," it is of "little surprise"

1   that "the right to seek class action relief in consumer cases has been extolled by California courts"

2   for nearly 40 years. *America Online v. Superior Court*, 90 Cal. App. 4th 1, 17-18 (2001); *La Sala*

3   *v. American Savs. & Loan Ass'n.*, 5 Cal.3d 864, 877 (1971); *Vasquez v. Superior Court*, 4 Cal.3d

4   800, 807-08 (1971); *State of California v. Levi Strauss & Co.*, 41 Cal.3d 460, 471 (1986)

5   ("California courts have recognized that the consumer class action is an essential tool for the

6   protection of consumers against exploitative business practices"); *Hewlett Packard v. Superior*

7   *Court*, 167 Cal. App. 4th 87, 96 (2008).

8           This case is ideally suited to class treatment, because it involves a uniformly

9   defective product.  Moreover, unlike personal injury claims, product liability/property damage

10  claims typically require a common repair method, making class-wide damages relatively easy to

11  calculate.

12          **B.      The Proposed Class Satisfies Rule 23.**

13              **1.      The Legal Standard**

14          To be certified, a class must satisfy the four requisites of Rule 23(a) and at least

15  one part of Rule 23(b).  Fed. R. Civ. Proc. 23.  The class certification analysis is made without

16  consideration of the merits of the underlying claims.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S.

17  156, 177 (1974).  The Ninth Circuit "has adopted a liberal construction of Rule 23."  *E.E.O.C. v.*

18  *Gen. Tel. Co. of Northwest, Inc.*, 599 F.2d 322, 328–29 (9th Cir. 1979); *Bower v. Bunker Hill Co.*,

19  114 F.R.D. 587, 592 (E.D. Wash. 1986).

20              **2.      Plaintiffs Satisfy The Four Requirements Of Rule 23(A)**

21          Rule 23(a) provides:

22              One or more members of a class may sue or be sued as
                representative parties on behalf of all only if (1) the class is so
23              numerous that joinder of all members is impracticable, (2) there are
                questions of law or fact common to the class, (3) the claims or
24              defenses of the representative parties are typical of the claims or
                defenses of the class, and (4) the representative parties will fairly
25              and adequately protect the interests of the class.

26  Fed. R. Civ. Proc. 23(a).  These four requisites are commonly referred to as "numerosity,"

27  "commonality," "typicality," and "adequacy."   Plaintiffs' proposed Class satisfies all four

28  requirements.

### a.     The Members Of The Proposed Class Are So Numerous That Joinder Is Impracticable.

Rule 23(a) requires that the proposed Class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. Proc. 23(a)(1).  Joinder can be impracticable even where it is not impossible.  *See Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964); *see also Negrete v. Allianz Life Ins. Co. of N. America*, 238 F.R.D. 482, 487 (C.D. Cal. 2006).  While there is no fixed rule regarding the requisite number of class members, a class with more than 40 members usually is generally sufficient.  *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319, n.10 (9th Cir. 1980), *opinion amended*, 726 F.2d 1366 (9th Cir. 1984) (collecting cases); *see also* 1 *Newberg on Class Actions* (4th ed. 2002 and 2008 Supplement) ("*Newberg*") § 3:5 (collecting cases).  The exact number of class members need not be known with precision.  *Perez-Funez v. District Director*, 611 F. Supp. 990, 995 (C.D. Cal. 1984).  A "reasonable estimate of the number of purported class members satisfies the numerosity requirement of Rule 23(a)(1)."  *In re Badger Mountain Irr. Dist. Secs. Litig.*, 143 F.R.D. 693, 696 (W.D. Wash. 1992).  This is particularly true in cases where the number of individuals affected by Defendants' wrongful conduct is inherently within the Defendant's control.  *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 233-34 (C.D. Cal. 2003).

The number of people included in the Proposed Class here make joinder of all claimants in this action impracticable.  Here again, the average home contains 20 windows (Cassell Decl. ¶48)  Given that Viking produced in excess of one million Series 3000 windows, the class is estimated at approximately 50,000 homeowners.  There is no question that joinder of thousands of individual homeowners is impracticable.

### b.     This Case Presents Common Questions of Law and Fact.

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  Importantly, it does not require that *all* questions of law or fact be common to *every* member of the class; rather, it suffices if even only one issue is common to the claims of all the class members.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998); 1 *Newberg* § 3.10; *see also Chamberlan*, 223 F.R.D. at 526, *aff'd* 402 F.3d 952; *Mazza v. American Honda Motor Co.*,

254 F.R.D. 610, 618 (C.D. Cal. 2008).  *See also Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003) (federal courts construe Rule 23(a)(2) liberally); *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (certification is appropriate where "the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable").

"Commonality is generally satisfied where, as in this case, "the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001); *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir.1985). Differences in the ways in which these practices affect individual members of the class do not undermine the finding of commonality.  *Armstrong*, 275 F.3d at 868 (finding commonality requirement satisfied despite individual class members having different disabilities, since all suffered similar harm as a result of defendant's actions)." *Kincaid v. City of Fresno*, 244 F.R.D. 597 (E.D. Cal. 2007).

The Viking Series 3000 windows are the same.  The materials used in each of the three window types are exactly the same. The design and manufacture of the windows was the same from the time Viking started production in 1989 through the time it finished production in 1999.  (Birka-White Declaration, Exhibit C, Cruz Depo., 12:3-25, 13:1-12).  The liquid sealant, PTI 200 was used in all Viking Series 3000 windows throughout the class period, March 1991-1999.  (Birka-White Declaration, Exhibit D, Depo. of Troy Farr, 61:23-25, 62:1; Cassell Decl. ¶¶21, 22, 23).

Because these windows are all manufactured in the same manner, there are a number of common questions of law and fact, including:

(a)     Whether the Series 3000 Windows are defective because they allow moisture to penetrate into the interior of the home, fail prematurely, and are unsuitable for use as a window product and so are strictly liable to Plaintiffs and the Class;

(b)     Whether Viking knew or should have known that the Series 3000 Windows were defective and would fail prematurely, and are unsuitable for use as a window product;

- 11 -

(c)     Whether Viking created express warranties to Plaintiffs and the Class with respect to the Series 3000 Windows and breached these warranties;

(d)     Whether Viking breached the implied warranty of merchantability with respect to the Series 3000 Windows;

(e)     Whether Viking violated the provisions of the Consumer Legal Remedies Act, Civil Code §§ 1770, *et seq.*;

(f)     Whether Viking is liable to Plaintiffs and the Class for fraudulent concealment/nondisclosure;

(g)     Whether Viking owed Plaintiffs and the Class a duty of reasonable and ordinary care in the formulation, testing, design, manufacture, marketing, sale, and supply of the Series 3000 Windows; and

(h)     Whether Viking breached its duty of care to Plaintiffs and the Class in the formulation, testing, design, manufacture, marketing, sale, and supply of the Series 3000 Windows, by failing to promptly remove the Series 3000 Windows from the marketplace, or taking other appropriate remedial action for the benefit of the Class, thereby proximately causing damage to Plaintiffs and the Class.

These common questions center on the defective design and manufacture of the lower corner of the Series 3000 Windows, Viking's knowledge of the defect, and Viking's course of conduct with respect to the representation of the quality of the windows and the warranty. Each of these several questions is common to each member of the class, and any one of these common questions would satisfy Rule 23(a)(2).

### c.     The Claims of the Representative Plaintiffs Are Typical of the Claims of All Class Members.

Rule 23(a)(3) requires that "the claims and defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. Proc. 23(a)(3). "The test of typicality is whether (1) other members have the same or similar injury, (2) the action is based on conduct which is not unique to the named plaintiffs, and (3) other class members have been injured by the same course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001);

1   *see also Chamberlan*, 223 F.R.D. at 526, *aff'd* 402 F.3d 952 (holding that typicality requirement

2   is satisfied where plaintiffs and class members all have claims arising from the same fraudulent

3   scheme), *Hansen v. Ticket Track, Inc.*, 213 F.R.D. 415 (W.D. Wash. 2003); *Fernandez v. Dep't of*

4   *Soc. and Health Servs.*, 232 F.R.D. 642, 645 (E.D. Wash. 2005).  Representative claims are

5   typical if they are "reasonably coextensive with those of the absent class members."

6   *Chamberlan*, 223 F.R.D. at 526, *aff'd* 402 F.3d 952; *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 660

7   (E.D. Cal. 2008).

8           In the Ninth Circuit, courts "do not insist that the named plaintiffs' injuries be

9   identical with those of the other class members, only that the unnamed class members have

10  injuries similar to those of the named plaintiffs and that the injuries result from the same,

11  injurious course of conduct."  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001); *Hanon v.*

12  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *GMRI*, 252 F.R.D. at 661-62; *Kincaid v.*

13  *City of Fresno*, 244 F.R.D. 597, 603 (E.D. Cal. 2007) (The requirement is satisfied where

14  plaintiffs "challenge a uniform policy" toward all class members").  "Typicality is satisfied so

15  long as the named plaintiffs' claims "stem 'from the same event, practice, or course of conduct

16  that forms the basis of the class claims and [is] based upon the same legal remedial theory.'"

17  *Mortimore v. Fed. Deposit Ins. Corp.*, 197 F.R.D. 432, 436-437 (W.D. Wash. 2000) (quoting

18  *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1321 (9th Cir. 1982), *vacated on other grounds*,

19  459 U.S. 810 (1982)).

20          Here, the Class sought to be certified includes all current owners of residential

21  property in California in which Series 3000 Windows are or have been installed.  Also included

22  are former owners of such property who replaced the Series 3000 windows as a result of their

23  failure of the Series 3000 Windows.  The representative plaintiffs, Lynda and Lloyd Cartwright,

24  are current owners of residential property in which Series 3000 Windows are installed.

25  (Cartwright Decl. ¶ 2).  They also have warranty claims as they purchased the Series 3000

26  windows directly, and so can also represent the Warranty Subclass.

27          The Cartwrights allege on behalf of themselves and all class members that Viking

28  engaged in a common course of conduct to put a defective product on the market and to conceal

1   the nature of the defect from purchasers.  They allege that Viking knew the windows were

2   defectively designed and manufactured, that they fail prematurely, and that they do not perform

3   as expressly warranted and represented by the Viking.  (Cartwright Decl. ¶ 35)   These allegations

4   form the basis of the Cartwrights' claims and the claims of every member of the Class.  As such,

5   the typicality requirement is well satisfied here.  *See Chamberlan v. Ford Motor Co.*, 223 F.R.D.

6   at 526 (allegations of "the same unlawful conduct which affects both the named plaintiffs and the

7   putative class usually satisfy the typicality requirement irrespective of the varying fact patterns

8   underlying the individual claims").

9          **d.     The Representative Plaintiffs Will Fairly and Adequately**
               **Protect the Interests of the Class.**

10

11          Rule 23(a)(4) requires that the representative plaintiffs will "fairly and adequately"

12   protect the interests of the class.  The Ninth Circuit has set forth a two-prong test for the adequacy

13   requirement:  "(1) Do the representative plaintiffs and their counsel have any conflicts of interest

14   with other class members: and (2) will the representative plaintiffs and their counsel prosecute the

15   action vigorously on behalf of the class?"  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.

16   2003); *Hanlon*, *supra*, 150 F.3d at 1020.  Both prongs are satisfied here.

17          There is no question that the Cartwrights' interests are aligned with the interests of

18   the entire class.  All own or owned residential property with defective Series 3000 Windows.

19   Members of warranty subclass  received the same representations from Viking.  They received a

20   "lifetime" warranty from Viking similar to the warranties received by other class members and

21   assert a claim, thereunder, as does the Class generally.  Their windows have failed and caused

22   damage for reasons common to the class (Cartwright Decl. ¶¶6, 9)  They have exactly the same

23   interest as all other homeowners and former homeowners in the class in obtaining redress for

24   damages resulting from the Viking windows and are asserting the same claim.  Certainly, the

25   underlying facts, proven in court, will benefit all.  *Hanlon*, 150 F.3d at 1021 ("adequacy satisfied

26   where "each plaintiff has the same problem:  an allegedly defective rear latchgate which requires

27   repair or commensurate compensation").

28          The second prong of the adequacy analysis is also satisfied.  Plaintiffs' counsel

1   have extensive experience in consumer fraud and product defect cases.  They have litigated

2   literally dozens of similar cases, including several trials, and handled all aspects of the

3   administration of settlement funds.  (Birka-White Decl. ¶¶3-11; Nelson Decl. ¶¶3-4.)  Plaintiffs

4   and their counsel will continue to prosecute this action vigorously.  (Cartwright Decl. ¶10, Birka-

5   White Decl. ¶3; Nelson Decl. ¶8.)  The final requirement of Rule 23(a) is readily satisfied.

6                    **3.       Plaintiffs Satisfy the Requirements of Rule 23(b)(3)**

7                    In addition to the requirements of Rule 23(a), the proposed Class must meet satisfy

8   one of the three subsections of Rule 23(b).  Here, the proposed Class satisfies the requirements of

9   subsection (b)(3), which requires that:

10                   questions of law or fact common to class members predominate
                     over any questions affecting only individual members, and that a
11                   class action is superior to other available methods for fairly and
                     efficiently adjudicating the controversy.
12

13  Fed. R. Civ. Proc. 23(b)(3).  "Rule 23(b)(3) encompasses those cases 'in which a class action

14  would achieve economies of time, effort, and expense, and promote ... uniformity of decision as

15  to persons similarly situated, without sacrificing procedural fairness or bringing about other

16  undesirable results.'  *Amchem Prods., Inc.*, 521 U.S. at 615, 117 S.Ct. 2231 (*quoting* Fed.R.Civ.P.

17  23 Advisory Committee's Notes)."  *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 668 (C.D. Cal.

18  2009).

19                   a.       **Common questions of law and fact predominate over individual
                              issues.**
20

21                   The common questions of law and fact raised by this proposed Class overwhelm

22  any individual issues.  "When common questions present a significant aspect of the case and they

23  can be resolved for all members of the class in a single adjudication, there is clear justification for

24  handling the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at

25  1022.  Because proof of the claim revolves around the manufacture and marketing of a product—

26  which does not vary across plaintiffs— "[p]redominance is a test readily met in certain cases

27  alleging consumer . . . fraud . . . ."  *Amchem Prods., Inc.*, 521 U.S. at 625, 117 S.Ct. 2231

28  (internal citations omitted); *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("the class is

1  united by a common interest in determining whether a defendant's course of conduct is in its

2  broad outlines actionable").  This is true even where some individual issues exist.  "When one or

3  more of the central issues in the action are common to the class and can be said to predominate, [a

4  class action] will be considered proper . . . even though other matters will have to be tried

5  separately."  *Gartin v. S & M Nutec, LLC*, 245 F.R.D. 429, 435 (C.D. Cal. 2007) (class action

6  appropriate where "one or more of the central issues in that action are common to the class . . .

7  even though other matters will have to be tried separately"); *Wiener v. Dannon Co., Inc.*, 255

8  F.R.D. 658, 668 (C.D. Cal. 2009).

9         Here, the primary legal and factual questions presented by the class claims are

10  overwhelmingly common.  They involve the design and manufacture of the Series 3000

11  Windows, Viking's representations regarding the quality of the windows, including its lifetime

12  warranty in marketing literature and *stickers placed on every window*.  These questions involve

13  Viking's course of conduct and do not vary across the class members. "Because, by definition,

14  every member of the class must have bought one of the Products and, thus, seen the packaging,

15  Plaintiffs have succeeded in showing that the alleged misrepresentations were made to all class

16  members." *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009) (*citing Vasquez*,

17  94 Cal.Rptr. 796, 484 P.2d at 973; *Osborne, et al.*, 243 Cal.Rptr. at 823); s*ee, e.g., Grays Harbor

18  Adventist Children's School v. Carrier Corp.*, 242 F.R.D. 568, 573 (W.D. Wash. 2007)

19  ("Common questions predominate here.  One common question is whether Carrier's furnaces are

20  defective by design, regardless of any individual factors[.]  Another core issue is whether and

21  when Carrier knew about the defect, and whether it had a duty to disclose that fact to

22  consumers."); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 526 -527 (N.D. Cal. 2004),

23  affirmed, *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) ("[C]ommon

24  questions include whether the design of the plastic intake manifold was defective, whether Ford

25  was aware of the alleged design defects, whether Ford had a duty to disclose its knowledge,

26  whether it failed to do so, whether the facts that Ford allegedly failed to disclose were material,

27  and whether the alleged failure to disclose violated the CLRA. Common questions thus

28  predominate over individual questions in this case.")

As in these cited cases, the factual and legal issues relevant to the claims of Class members are common and their classwide resolution appropriate.  First, Viking Series 3000 windows were mass-produced and so virtually identical.  The lower corners leak because of design defects involving Viking's use of a sealant unsuitable for the application and because of the manufacturer's uniform misapplication of the sealant.  There is therefore no reason to require each homeowner to establish individually that the windows are inherently defective.  Such a showing would be extremely difficult for an individual homeowner and would waste individual in unnecessary repetitive proof.

Second, to recover on a products liability theory, a plaintiff must show that the Viking windows do not meet the performance expectations of a "hypothetical" or "reasonable" consumer.  *Smith v. Marilyn M. Fishing, Inc.*, 173 Cal.App.3d 453, 459 (1985), citing *Campbell v. General Motors Corp.*, 32 Cal.3d 112, 126 n.6 (1982).  This issue need only be decided once.  The same is true for the UCL and the CLRA claims, which are focused on the conduct of Viking and not on the conduct of the class members themselves.

Third, Plaintiffs' negligence claims likewise raise common questions of law and fact.  Either the Viking windows were consistent with the existing standard of care for manufacturers of window products or they were not.

Likewise, Viking made identical lifetime warranties to all purchasers of the Viking Series 3000 windows post-March 1991, and the windows have already failed or are substantially certain to fail long before the expected useful life of the windows.  Those class members with warranty claims (*i.e.*, the warranty subclass) have common claims.  *Hicks et al. v. Kaufman & Broad Home Corp., et al.*, 89 Cal.App.4th 908, 197 Cal.Rptr.2d 761 (2001).[2]

---

[2] *Hicks* involved an unusual factual situation and certified a class only for warranty, not product liability claims.  In *Hicks*, unlike most defective product claims, the defective product itself did not cause property damage.  *Id.* at 764.  The product was Fibermesh, a substitute for welded wire mesh used in concrete floor slabs.  *Id* Fiber mesh did not crack concrete.  Rather, concrete would crack from other sources, such as soil erosion or an earthquake.  *Id.*  The fiber mesh was simply less effective at preventing wide cracks in concrete than were other types of mesh commonly available.  Since many homeowners had not yet experienced an event causing cracking, the court held there was no class-wide strict liability claim, only a warranty claim.  In the present case, as in other products cases certified by California courts, the Viking windows cause property damage, and may continue to cause damage to the Class by virtue of its inherent design.

1         Finally, damage issues in this case are also predominantly common.  The questions

2    relevant to a homeowner's general damages, *i.e.*, how much a homeowner is entitled to recover to

3    repair or replace the defective windows, are common and should be decided in a single action.

4    Both the cost of the materials and the cost of labor can be ascertained by simple market surveys.

5    After such information is obtained, the damage calculation is simply a matter of mathematics.

6    The calculation of class-wide damages by means of a formula or guidelines is well-accepted in

7    class action jurisprudence.

8         *Newberg* states the rule as follows:

9         [W]hen monetary relief is sought, and data from each class member
     is required to assess individual recovery entitlement, it is still
10   possible in most cases for the class representatives to develop and
     prove common guidelines or formulae that will apply to determine
11   the measure of recovery for each individual proof of claim . . . .
     There are occasions when it is feasible and reasonable to prove
12   aggregate monetary relief for the class from an examination of the
     defendant's records, or by use of a common formula or
13   measurement of damages multiplied by the number of transactions,
     units or class members involved, or by reasonable approximation
14   with proper adherence to recognized evidentiary standard.

15   3 *Newberg*, § 10:01.

16        Even in cases where *all* of the plaintiff's damages must be established in separate

17   proceedings, courts have recognized the utility of the class action procedure to establish liability.

18   For example, the court in *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal.App.3d 1341

19   (1987), stated the rule as follows:

20        Finally, the [trial] court found that even if the violation and impact
     issues presented common questions, they would still be
21   overshadowed by the separate individual damage issues if the
     plaintiff class prevails on the liability issue.  *It has been repeatedly*
22   *held, however, that the presence of individual damage issues*
     *cannot bar certification*.  As the court stated in *Samuel v. University*
23   *of Pittsburgh* (3d Cir. 1976) 538 F.2d 991:  "In almost every class
     action, factual determinations [of damages] . . . to individual class
24   members must be made. [Citations.] Still we know of no case where
     this has prevented a court from aiding the class to obtain its just
25   restitution.  Indeed, *to decertify a class on the issue of damages or*
     *restitution may well be effectively to sound the death-knell of the*
26   *class action device*."  [Citations omitted.]

27          .     .     .

28        At this stage we are not prepared to state which method would be

- 18 -

1    appropriate to resolve the individual damage questions presented.
     This question need not be resolved until the class-wide issues have
2    been determined.

3    *Id.* at 1354 (Emphasis added).  *Newberg* agrees that "[i]ndividual damage issues should not,

4    except in extraordinary situations, have any adverse effect on the propriety of aggregate class

5    judgments as a proper means for determining the defendant's liability to the class."  3 *Newberg*,

6    § 10:2.  Here, *both* liability and damages are subject to class-wide proof, making certification

7    appropriate.

8           **b.    A class action is the superior method for the fair and efficient
                   adjudication of this controversy.**
9

10          A class action is superior to other methods of litigation where, as here, "classwide

11   litigation of common issues will reduce litigation costs and promote greater efficiency" and "no

12   realistic alternative [to classwide treatment] exists."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d

13   1227, 1234-1235 (9th Cir. 1996).  Rule 23(b)(3) lists the following factors to guide the superiority

14   inquiry:  the class members' interests in individually controlling the prosecution or defense of

15   separate actions; the extent and nature of any litigation concerning the controversy already begun

16   by or against class members; the desirability or undesirability of concentrating the litigation of the

17   claims in the particular forum; and the likely difficulties in managing a class action.  Fed. R. Civ.

18   Proc. 23(b)(3).  Plaintiffs address each factor in turn.

19          **i.    The interest of individual class members in controlling
                   the litigation.**
20

21          Individual prosecution of these claims is impractical—the cost of litigating a single

22   case would exceed the potential return.  There is literally nothing to suggest that any class

23   member would benefit from individual adjudication, which would require individual funding of

24   expensive expert analysis, and attorneys' fees, among other litigation costs, that would exceed the

25   likely total damages.  *See Mazza v. American Honda Corp.*, 254 F.R.D. 610, 628 (C.D. Cal.

26   2008) (where "potential damages for each class member are approximately $4000, the Court finds

27   that the individual class members do not have a strong interest in controlling the litigation").

28

1

2

ii.      **The extent and nature of litigation already commenced by the class.**

3   Aside from the present case, there is one other pending class action involving the

4   Series 3000 Windows.  That action, *Deist v. Viking Industries, Inc.*, Case No. CV025771, is

5   pending in California state court in San Joaquin County and has recently had a litigation class

6   certified in express and implied warranty.  (*See* Request for Judicial Notice of Class Certification

7   Order).  Importantly, however, this *Cartwright* action presents viable claims that are not raised in

8   the *Deist* case and are therefore not proceeding in any other action.  These claims include

9   negligence, strict liability, Consumer Legal Remedies Act, and Business and Professional Code

10  Section 17200 and 17500.  As a result, only the original owners who remain current owners

11  (likely 20% of the *Cartwright* class) are class members in *Deist*. Here, current owners who were

12  not original owners are Class members, as are former owners who replaced Viking windows.

13

14

iii.      **The desirability of concentrating the litigation in a given form.**

15  Concentrating the litigation in this Court will allow the litigation to proceed in an

16  efficient manner without the risk of inconsistent outcomes.  The Series 3000 Windows were

17  marketed and sold in California, and the proposed class is a California statewide class.

18

iv.      **The case is manageable as a class action.**

19  This case presents no manageability issues that preclude certification.  The critical

20  issues for resolution arise from a common nucleus of operative facts.  Proof of these issues as to

21  any one class member is proof as to them all.  The law of a single state will apply.  For all these

22  reasons, this action is manageable as a class action.

23  V.    **CONCLUSION**

24  Substantially all of the liability and damage issues raised in this litigation are

25  common to all claimants.  The only practical and equitable means for resolving the issues raised

26  by this case, and, specifically, by the defective windows at issue, is through a class action.  A

27  better use of the class action device can scarcely be imagined.

28

1    For all the above reasons, Plaintiffs respectfully request that the Court grant their

2    motion for class certification.

3    Dated: May 22, 2009                    Respectfully submitted,

4                                            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

5

6                                            By: _____

7                                                 Robert J. Nelson

8                                            Robert J. Nelson (State Bar No. 132727)
                                             Steve M. Swerdlow (State Bar No. 250344)
9                                            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                             Embarcadero Center West
10                                           275 Battery Street, 30th Floor
                                             San Francisco, CA  94111 3339
11                                           Telephone:  (415) 956 1000
                                             Facsimile:  (415) 956 1008

12                                           David M. Birka-White (State Bar No. 85721)
                                             BIRKA-WHITE LAW OFFICES
13                                           411 Hartz Avenue, Suite 200
                                             Danville, CA  94526
14                                           Telephone:  (415) 616-9999
                                             Facsimile:  (415) 616-9494

15

16                                           *Attorneys for Plaintiffs*
                                             *Lynda Cartwright and Lloyd Cartwright on Behalf of*
17                                           *Themselves and All Others Similarly Situated*

18

19

20

21

22

23

24

25

26

27

28

CASE NO.  2:07-CV-2159-FCD-EFB
PLAINTIFFS' MPA ISO MTN FOR CLASS
CERTIFICATION