1   Robert J. Nelson (State Bar No. 132797)
    Steve Swerdlow (State Bar No. 250344)
2   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    Embarcadero Center West
3   275 Battery Street, 30th Floor
    San Francisco, CA  94111-3339
4   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
5
    David M. Birka-White (State Bar No. 85721)
6   BIRKA-WHITE LAW OFFICES
    411 Hartz Avenue, Suite 200
7   Danville, CA  94526
    Telephone:  (415) 616-9999
8   Facsimile:  (415) 616-9494

9   *Attorneys for Plaintiffs Lynda and Lloyd Cartwright*

10

11                **UNITED STATES DISTRICT COURT**

12              **EASTERN DISTRICT OF CALIFORNIA**

13                  **SACRAMENTO DIVISION**

14

15  LYNDA CARTWRIGHT and LLOYD          Case No.  2:07-cv-2159-FCD-EFB
16  CARTWRIGHT, on behalf of themselves
    and all others similarly situated,
17                                      **PLAINTIFFS' REPLY BRIEF IN
                 Plaintiffs,            SUPPORT OF MOTION FOR CLASS
18                                      CERTIFICATION**
    v.
19
    VIKING INDUSTRIES, INC., an Oregon  Date:       August 7, 2009
20  Corporation, and DOES 1-100, inclusive,  Time:       10:00 a.m.
                                        Courtroom:  2
21               Defendants.            Honorable Frank C. Damrell, Jr.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  SUMMARY OF THE EXPERT TESTIMONY ................................................. 2

III.  SUMMARY OF EVIDENCE .............................................................................. 7

IV.  ARGUMENT ....................................................................................................... 9

    A.  The *Deist* Action Does Not And Should Not Prevent Class Certification Of This Action. ...................................................................... 9

    B.  Common Questions Of Law And Fact Predominate Over Individual Issues. .......................................................................................... 11

        1.  Individual Issues Of Standing Do Not Bar Class Certification. ................................................................................... 11

        2.  Individual Issues Related To Statutes Of Limitations Do Not Bar Class Certification. .................................................. 12

        3.  Common Questions Predominate For The Fraud, UCL And CLRA Claims. ......................................................................... 13

        4.  Common Questions Predominate For The Strict Liability And Negligence Claims. ............................................................... 19

        5.  Common Questions Predominate With Respect To Plaintiffs Warranty Claims. ...................................................................... 20

            a.  Claims For Breach Of Warranty Do Not Require An Individual  Determination That A Defect Has Manifested. ................................................................. 20

            b.  Individual Notice Issues Do Not Predominate Over The Common Question Of Viking's Liability. ................. 22

            c.  This Court Has Already Held That Plaintiffs And The Class Are In Privity With Viking............................. 24

    C.  The Class Representatives Satisfy The Typicality Requirements Of Rule 23. .................................................................................................. 25

    D.  Class Treatment Is The Superior Method Of Resolution......................... 26

        1.  The Parallel *Deist* Action Does Not Defeat Superiority. .............. 26

        2.  The Proposed Class Action Is Manageable.................................. 27

V.  CONCLUSION .................................................................................................. 29

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Alba v. Papa John's USA, Inc.,*
  2007 WL 953849 (C.D. Cal. 2007)..................................................................... 28

5

6

*American Suzuki Motor Corp. v. Superior Court,*
  37 Cal. App. 4th 1291 (1995) ..................................................................... 20, 21

7

*Andrews Farms v. Calcot, Ltd.,*
  Slip Copy, 2009 WL 1211374 (E.D. Cal. 2009) ............................................... 25

8

9

*Anthony v. General Motors,*
  33 Cal.App.3d 699 (1973)......................................................................... 20, 24

10

*Arata v. Tonegato,*
  152 Cal.App.2d 837 (1957)............................................................................. 22

11

12

*Arthur Young & Co. v. U.S. Dist. Court,*
  549 F.2d 686 (9th Cir. 1977)........................................................................... 28

13

*Atkinson v. Elk Corp. of Texas,*
  142 Cal.App.4th 212 (2006) ........................................................................... 24

14

15

*B.W.I. Custom Kitchen v. Illinois,*
  191 Cal.App.3d 1341 (1987)........................................................................... 19

16

*Bank of the West v. Superior Court,*
  2 Cal.4th 1254 (1992) .................................................................................... 14

17

18

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975)........................................................................... 27

19

*Cartwright v. Viking Industries, Inc.,*
  249 F.R.D. 351 (E.D. Cal. 2008) ..................................................... 17, 18, 24

20

21

*Castano v. American Tobacco Co.,*
  84 F.3d 734 (5th Cir. 1996)............................................................................. 28

22

*Chamberlan v. Ford Motor Company,*
  223 F.R.D. 524 (N.D. Cal. 2004)................................................................ 16, 17

23

24

*Colorado River Conservation District v. United States,*
  424 U.S. 800 (1976) ....................................................................................... 10

25

*Committee on Children's Television, Inc. v. General Foods Corp.,*
  35 Cal.3d 197 (1983) ..................................................................................... 14

26

27

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh,*
  217 Cal.App.2d 492 (1963)............................................................................. 22

28

- ii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Daffin v. Ford Motor Co.*,
  458 F.3d 549 (6th Cir. 2006) ........................................................................................ 21

*Daugherty v. American Honda Motor Co., Inc.*,
  144 Cal.App.4th 82 (2006) ..................................................................................... 16, 17

*Falk v. General Motors Corp.*,
  496 F. Supp. 2d 1088 (N.D. Cal. 2008) ......................................................................... 14

*Frieman v. San Rafael Rock Quarry, Inc.*,
  116 Cal.App.4th 29 (2004) ........................................................................................... 21

*Gilbert Financial Corp. v. Steelform Contracting Co.*,
  82 Cal.App.3d 65 (1978) ......................................................................................... 17, 24

*Grays Harbor Adventist Christian School v. Carrier Corp.*,
  242 F.R.D. 568 (W.D. Wash. 2007) .............................................................................. 13

*Greenman v. Yuba Power Products*,
  59 Cal.2d 57 (1963) ...................................................................................................... 22

*Hampton v. Gebhardt's Chili Powder Co.*,
  294 F.2d 172 (9th Cir.1961) .......................................................................................... 23

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1988) ....................................................................................... 25

*Hanon v. Dataprods. Corp.*,
  976 F.2d 497 (9th Cir. 2002) ......................................................................................... 25

*Harmsen v. Smith*,
  693 F.2d 932 (9th Cir. 1982) ......................................................................................... 28

*Hicks v. Kaufman & Broad*,
  89 Cal.App.4th 908 (2001) ....................................................................................... 20, 21

*In re Enron Corp. Securities*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................................................... 13

*In re Ford Motor Co. E-350 Van Products Liability Litigation (No. II)*,
  No. 03-4558, MDL No. 1687, 2008 WL 4126264 (D. N.J. Sep. 2, 2008) ..................... 20

*In re General Motors Corp. Dex-Cool Prod. Liab. Litig.*,
  241 F.R.D. 305 (S.D. Ill. 2007) ..................................................................................... 11

*In re HP Inkjet Printer Litig.*,
  2006 WL 563048 (N.D. Cal. Mar. 07, 2006) ................................................................. 23

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) .......................................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ............................................................. 27

*In re Monumental Life Ins. Co.*,
  365 F.3d 408 (5th Cir. 2004), *cert. denied sub nom. Am. Nat. Ins. Co. v. Bratcher*, 543 U.S.
  870, 125 S.Ct. 277, 160 L.Ed.2d 117 (2004) ........................................... 13

*In re Tobacco Cases II*,
  46 Cal.4th 298 (Cal. 2009)........................................................... 12, 14, 15

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  527 F. Supp. 2d 1053 (N.D. Cal. 2007) .................................................. 26

*In re WorldCom, Inc. Securities Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................ 13

*Intel v. Advanced Micro Devices, Inc.*,
  12 F.3d 908 (9th Cir. 1993)................................................................... 10

*Keilholtz v. Superior Fireplace Co.*,
  No. C 08-00836 CW, 2009 WL 839076 (N.D. Cal. Mar. 30, 2009) ................. 17, 18

*Krusi v. S. J. Amoroso Construction Co., Inc.*,
  81 Cal.App.4th 995 (2000) ................................................................... 12

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001)............................................................... 23

*Massachusetts Mutual Life Ins. Co. v. Superior Court*,
  97 Cal.App.4th 1282 (2002) ................................................................. 14

*Mazza v. American Honda Motor Co.*,
  254 F.R.D. 610 (C.D. Cal. 2008) ........................................................... 26

*McAdams v. Monier, Inc.*,
  60 Cal.Rptr.3d 111 (Cal.App.3 Dist. 2007) .......................................... 18, 19

*Metowski v. Traid Corp.*,
  28 Cal.App.3d 332 (1972)..................................................................... 23

*Meyer v. Sprint Spectrum*,
  45 Cal. 4th 634 (2009) ........................................................................ 15

*Osbourne v. Subaru of America, Inc.*,
  198 Cal.App.3d 646 (1988)................................................................... 16

*Prata v. Superior Court*,
  91 Cal.App.4th 1128 (2001) ................................................................. 14

*Romero v. Producers Dairy Foods, Inc.*,
  235 F.R.D. 474 (E.D. Cal. 2006) ........................................................... 26

**TABLE OF AUTHORITIES**
(continued)

Page

*Rosario v. Livaditis,*
   963 F.2d 1013 (7th Cir. 1992)..................................................................26

*Saltzman v. Pella Corp.,*
   No. 1:06-cv-04481, 2009 WL 1637692 (N.D. Ill., June 4, 2009).....................13, 20

*Schwartz v. Visa Intern. Corp.,*
   No. 822404-4, 2003 WL 1870370 (Cal. Sup. Ct. Apr. 7, 2003).......................17

*Shell v. Schmidt,*
   126 Cal.App.2d 279, 272 P.2d 82 (1954) ..........................................24

*Simpson v. Fireman's Fund Ins. Co.,*
   231 F.R.D. 391 (N.D. Cal. 2005).................................................26

*Smith v. Central Ariz. Water Conservation Dist.,*
   418 F.3d 1028 (9th Cir. 2005)....................................................10

*Stickrath v. Globalstar, Inc.,*
   527 F. Supp. 2d 992 (N.D. Cal. 2007) ............................................15

*Trotsky v. Los Angeles Federal Savings and Loan Assoc.,*
   48 Cal.App.3d 134 (1975)........................................................11

*Vaughn v. Dame Construction Co.,*
   223 Cal.App.3d 144 (1990).......................................................12

*Vuyanich v. Republic Nat'l Bank of Dallas,*
   82 F.R.D. 420 (N.D. Tex. 1979) .................................................12

*Waste Management Holdings, Inc. v. Mowbray,*
   208 F.3d 288 (1st Cir. 2000).................................................13, 27

*Wilkinson v. F.B.I.,*
   99 F.R.D. 148 (C.D. Cal. 1983) .................................................28

*Winkler v. DTE, Inc.,*
   205 F.R.D. 235 (D. Ariz. 2001) .................................................28

*Zinser v. Accufix Research Institute, Inc.,*
   253 F.3d 1180 (9th Cir. 2001)...................................................28

**STATUTES**

California Civil Code

   § 1559 ............................................................................24

   § 1760 ............................................................................17

   § 1770(a) .....................................................................17, 18

CASE NO.  2:07-CV-2159-FCD-EFB
PLAINTIFFS' REPLY BRIEF ISO
MOTION FOR CLASS CERTIFICATION

**TABLE OF AUTHORITIES**
(continued)

Page

§ 1782.........................................................................................................................1

**RULES**

Federal Rules of Civil Procedure

Rule 23 ..........................................................................................................10, 25, 28

Rule 23(a)(3) .............................................................................................................25

Rule 23(a)(4) .............................................................................................................25

Rule 23(b)(3) .............................................................................................................27

Rule 23(e) ..................................................................................................................13

**TREATISES**

1 H. Newberg & A. Conte,
  *Newberg on Class Actions* (4th ed. 2002), § 2:7........................................11

7 Alba Conte and Herbert B. Newberg,
  *Newberg On Class Actions* § 22:55 (4th ed.)............................................27

Moore's Federal Practice 3d,
  § 122.06[1] ..........................................................................................................10

*Reference Manual for Scientific Evidence, Second*
  (Federal Judicial Center, 2005-2006)..................................................... 2, 3

1

## I.      __INTRODUCTION__

2              Plaintiffs Lynda and Lloyd Cartwright filed this action ("the *Cartwright* action")

3   on August 16, 2007, in California state court.  At that time, the *Deist* case had been pending for

4   two and a half years, but had made little progress.  Concerned about both the delay and the fact

5   that *Deist* did not bring viable claims under California's consumer protection laws (the *Deist*

6   plaintiffs did not bring an Unfair Competition Law ("UCL") claim, nor a proper Consumer Legal

7   Remedy Act ("CLRA") claim), Plaintiffs filed this case in the same state court where *Deist* was

8   pending.

9              Contrary to Viking's claim, this case was *not* filed because counsel was unable to

10  reach a fee agreement with *Deist* counsel.  (Opp'n Br. 1, 15.)   This case was filed to protect the

11  interest of the *Cartwright* plaintiffs and the class, who have viable claims against Viking that

12  were not brought in the *Deist* action, and who have an interest in seeing their claims proceed

13  without extended delay.  Nor were *Cartwright* counsel "forum-shopping," as Viking suggests.

14  (Opp'n Br. 15.)  Indeed, the *Cartwright* action was filed in the same court as was *Deist*, but was

15  removed to this Court on petition from Viking.

16              Also contrary to Viking's claim, none of the class issues posed by this action has

17  been decided in *Deist*.  Importantly, the *Deist* summary judgment order does not dispose of any

18  claims for the entire class or resolve any of the common issues presented by the class claims in

19  either case.  (*Deist* Summ. J. Order, Thacker Decl., Ex. A.)  The summary judgment order held

20  that certain representative plaintiffs were barred on statute of limitations grounds or for lack of

21  privity.  These findings did not apply to the entire class – indeed, the *Deist* court certified the

22  class after ruling on summary judgment.

23              The *Deist* motion for class certification only sought certification of warranty

24  claims.  The CLRA claim was dismissed for failure to comply with Civil Code § 1782 (requiring

25  pre-filing notice of CLRA claims for damages), and the *Deist* plaintiffs did not seek certification

26  of the strict liability and negligence claims on behalf of class members whose windows had

27  failed.  Nor did the *Deist* plaintiffs seek certification of any claims on behalf of former owners

28

1  who suffered injury from the defective windows, nor, importantly, on behalf of current owners of

2  properties with Viking windows who are not the original owners of their property.

3       The *Cartwright* complaint presents viable claims on behalf of all of these

4  consumers.  The proposed class is substantially broader than the *Deist* class – indeed, only about

5  20 percent of the *Deist* class is overlapping with the proposed *Cartwright* class. (Declaration of

6  Michael Sullivan in Opposition to Class Certification, ¶38a).  Further, the proposed *Cartwright*

7  class also includes the key California consumer protection claims which the *Deist* class does not

8  for the small portion of the classes that do overlap.

9  **II.      SUMMARY OF THE EXPERT TESTIMONY**

10      The expert declarations filed by Viking in Opposition to Class Certification in the

11  *Deist* matter have now been resubmitted, almost verbatim in *Cartwright*.  While the Viking

12  experts repeatedly assert the same opinions, Viking appears to rely most heavily upon the

13  declaration of its statistician, Michael Sullivan.  Without any engineering or technical experience,

14  Sullivan asserts sweeping generalizations about the so-called "findings" of Viking's experts

15  regarding inspections in the *Deist* matter--which were in significant part were secretly performed

16  outside the knowledge or presence of  Plaintiffs' counsel in the  *Deist* case.  (Birka-White Reply

17  Declaration, ¶14.)

18      The Sullivan conclusions are inappropriately based upon a sample selected by

19  Viking that is *not* a random sample of the class of California homes with Viking windows, and, as

20  such, inconsistent with the *Reference Manual for Scientific Evidence, Second* (Federal Judicial

21  Center, 2005-2006) and accepted statistical practices.  His analysis almost certainly would not

22  survive a *Daubert* motion.  For example, the response rate of the persons who agreed to

23  participate in destructive testing was less than six percent of the sample and nowhere close to the

24  level sufficient to allow a statistician to conclude that the sample selected was representative of

25  the class or to apply the laws of probability, which should be in the 75-90 percent range.  *See,*

26  *e.g., Reference Manual*, at 245.  Further, [w]hen a survey is conducted at the request of a party for

27  litigation . . . a heightened standard for validation checks may be appropriate." *Id.* at 267.

28

1      Dr. Richard Drogin, plaintiff's statistician in *Cartwright,* unequivocally opines that

2 there is no statistical basis for Dr. Sullivan's conclusions concerning the windows or homeowners

3 in the class in that the sample selected by Viking is not a random sample. Further, the response

4 rate of the persons who agreed to participate in the interview, the inspection of their homes, and

5 destructive testing was too low to allow a statistician to conclude that the sample selected was

6 representative of the class. As a result, there is no statistical basis for the Dr. Sullivan's

7 conclusions concerning the windows or homeowners in the class and they should be disregarded.

8 (Drogin Reply Declaration, ¶¶5-9.)

9      Specifically, the set of homes from which Dr. Sullivan drew his sample excluded

10 at least 45 of the 60 counties in California, and excluded non-owner-occupied residences and

11 residents that did not speak English. (Drogin Reply Declaration, ¶5.) The *Reference Manual for*

12 *Scientific Evidence*, cited by Dr. Drogin in his deposition, addresses a tolerable level of non-

13 response in a probability sample as follows:

14
> One suggested formula for quantifying a tolerable level of
15
> nonresponse in a probability sample is based on the guidelines for
> statistical surveys issued by the former U.S. Office of Statistical
16
> Standards. According to these guidelines, response rates of 90% or
> more are reliable and generally can be treated as random samples of
> the overall population. Response rates between 75% and 90%
17
> usually yield reliable results, but the researcher should conduct
> some check on the representativeness of the sample. Potential bias
18
> should receive greater scrutiny when the response rate drops below
> 75%. If the response rate drops below 50%, the survey should be
19
> regarded with significant caution as a basis for precise quantitative
> statements about the population from which the sample was drawn.
20

21 *Reference Manual, supra*, at p. 245.

22      Further, Liability Management Systems (LMS), of which Dr. Sullivan is a

23 principal, boasts in its marketing information that it is uniquely geared to reduce the liability of

24 manufacturers by defeating class certification. For example, its website states:

25
> LMS plays an active role in preclass action lawsuits by assisting
> counsel to defeat certification through the use of advanced
26
> statistical methodologies and precise field studies to evaluate
> defendant's potential exposure and answer the plaintiff's
27
> allegations.

28

1   (*See* Birka-White Reply Declaration, ¶9, Exhibit F (Exhibit 15 to the Deposition of Michael

2   Sullivan.)  Admittedly the "leader" of the Viking expert team, Sullivan's mind likely was made

3   up well before the *Deist* inspections even began.  (*See* Birka-White Reply Declaration, ¶9,

4   Exhibit F,  Sullivan Depo. at 181:3-18.)

5            Despite his bias, the *Deist* test protocols and inspections he analyzed and oversaw

6   in *Deist* demonstrated an extraordinarily high failure rate.  The dozens of windows tested by

7   Viking with the "spray rack" water tests produced the unintended failure rate of a whopping 43%.

8   As high as that figure is, the failure rate would have been significantly higher had the testing

9   methodology employed by Viking complied with the American Society of Testing and Materials

10  ("ASTM") standards governing such tests.  (*See* Cassell Reply Declaration, ¶¶8, 9.)  This is

11  because Viking deliberately excluded from its testing the "pressure chamber test" which is

12  specifically designed to emulate wind driven rain.  (*See* Cassell Reply Declaration, ¶8.)  In effect,

13  Viking's "spray rack" testing was a "soft ball" clearly designed to produce "passing" results.

14  Although far less rigorous than a properly conducted water test consistent with ASTM 1105, the

15  Viking test protocol proved precisely what plaintiffs allege in both *Deist* and *Cartwright*--that the

16  Series 3000 windows leak at the lower corners at alarmingly high rates.

17           Inexplicably, in the *Deist* matter, not a single expert deposition has been taken in

18  connection with summary judgment on class certification.  In contrast, Plaintiff's counsel in the

19  *Cartwright* matter  took the considerable time,  effort, and expense to depose *every* Viking expert.

20  Those depositions produced, among other things, the following undisputed evidence which

21  demonstrates why classwide issues predominate:

22           1.     The lower corners of the Viking windows consist of metal to metal joints

23  and are not water tight. (*See*  Birka-White Reply Declaration, ¶5, Exhibit B, Cruz Depo. at 13:13-

24  18; 22:11-16; 24:19-25.)

25           2.     In order to be water tight, sealant must be properly applied to the jamb to

26  sill intersections. (*See*  Birka-White Reply Declaration, ¶5  Exhibit B, Cruz Depo. at 13:19-25,

27  14:1-16; 14:22-25, 15:1; 22:11-16; Birka-White Reply Declaration, ¶4 Exhibit A, Cortez Depo. at

28  37:10-18.)

1    3.    The Viking Series 3000 windows, and the three types of windows within

2    that series—single hung, sliders, and fixed windows—are identically designed at the corners.

3    (*See* Birka-White Reply Declaration, ¶5 Exhibit B, Cruz Depo. at 12:3-25, 13:1-12; Cassell

4    Declaration in Support of Motion for Class Certification, ¶22.)

5    4.    All Viking Series 3000 windows are designed, manufactured and

6    assembled in the same manner.  (*See* Birka-White Reply Declaration, ¶5,  Exhibit B, Cruz Depo.

7    at 12:3-13:12, Cassell Declaration in Support of Motion for Class Certification, ¶22.)

8    5.    The PTI 200 sealant was used in all Viking Series 3000 windows

9    (manufactured from 1989-1999).  (*See* Birka-White Reply Declaration, ¶10, Exhibit G, Farr

10   Depo. at 61:6-10; 61:23-25, 62:1.)

11   6.    ASTM 1105, the standard governing "spray rack" tests requires the use of a

12   pressure chamber.  (*See* Birka-White Reply Declaration, ¶8, Exhibit E, Tsongas Depo. at 16:4-

13   13.)

14   7.    Viking did not perform its water tests in compliance with the governing

15   ASTM 1105 testing standard in that it excluded the "pressure chamber."  (*See* Birka-White Reply

16   Declaration, ¶8, Exhibit E, Tsongas Depo. at 16:4-18.)

17   8.    "Spray rack" testing on windows which employs the "pressure chamber" is

18   a more rigorous test and is far more likely to produce a leak than if the "spray rack" test is

19   performed without a "pressure chamber."  (*See* Birka-White Reply Declaration, ¶8, Exhibit E,

20   Tsongas Depo. at 90:11-25.)

21   9.    43% of the windows tested by Viking in the *Deist* matter leaked at the

22   lower corners.  (*See* Birka-White Reply Declaration, ¶7,  Exhibit D, Wolf 30:20-25; Birka-White

23   Reply Declaration, ¶8, Exhibit E, Tsongas Depo. at 21:21-24; Cassell Declaration in Support of

24   Motion for Class Certification, ¶35.)

25   10.    All of the windows that leaked when subjected to the "spray rack" test

26   were resealed at the lower corners by Viking representatives and then subjected to an additional

27   "spray rack" test.  (*See* Birka-White Reply Declaration, ¶7, Exhibit D, Wolf Depo. at 37:10-24.)

28

1    11.    After being resealed, the windows which leaked were retested with the

2    "spray rack" test and did not leak.  (*See* Birka-White Reply Declaration, ¶8, Exhibit E, Tsongas

3    Depo. at 32:14-18; Birka-White Reply Declaration, ¶7, Exhibit D, Wolf Depo. at 37:25-38:3.)

4    12.    It is the intent of window manufacturers that the lower corners of all

5    aluminum windows be water tight.  (*See* Birka-White Reply Declaration, ¶8 Exhibit E, Tsongas

6    Depo. at 45:8-15;  *See* Birka-White Reply Declaration, ¶4, Exhibit A, Cortes Depo. at 28:5-13;

7    Birka-White Reply Declaration, ¶7, Exhibit D, Depo. at Wolf 43:9-25, 44:1-18.)

8    13.    If the sealant at the lower corners is misapplied or missing altogether it

9    constitutes an application failure which falls below the standard of care.  (*See* Birka-White Reply

10   Declaration, ¶5, Exhibit B, Cruz Depo. at 48:15-20; 176:9-17.)

11   14.    Notwithstanding the 43% failure rate of the Viking windows, none of the

12   Viking experts gathered evidence regarding *why* the windows leaked, nor did they  assess whether

13   the sealant had failed, was misapplied, or was missing.  (*See* Birka-White Reply Declaration, ¶8,

14   Exhibit E, Tsongas Depo. at 78:8-17; Birka-White Reply Declaration, ¶7, Exhibit D, Wolf Depo.

15   at 34:21-25, 35:1-7; 36:3-10; Birka-White Reply Declaration, ¶6, Exhibit C, Moalli Depo. at

16   60:25-61:1-5; Birka-White Reply Declaration, ¶9, Exhibit F, Sullivan Depo. at 125:13-23;

17   146:15-25, 147:1-4.)

18   15.    All Viking windows were represented to have an R-20 rating, a

19   certification which requires that the windows pass the testing methodology as set forth in ASTM

20   1105 or its equivalent.  (*See* Birka-White Reply Declaration, ¶8, Exhibit E, Tsongas Depo. at

21   17:5-25; 47:14-25, 48:1-5, Cassell Declaration in Support of Motion for Class Certification, ¶41.)

22   The only evidence presented by Viking which attempts to explain the alarmingly

23   high failure rate is what Viking contends was the high volume of water applied to the windows

24   during the "spray rack" tests.  This argument is belied by the simple fact that after Viking

25   resealed the lower corners of the leaking windows and re-tested them, employing the *same* "spray

26   rack" test and using the *same* volume of water, the windows did not leak—thus proving that the

27   volume of water was irrelevant if the lower corners were properly sealed.  (*See* Birka-White

28   Reply Decl., ¶8, Exh. E., Tsongas Depo. at 32:14-18; Birka-White Reply Decl., ¶7, Exh. D., Wolf

1  Depo. at 37:25-38:3.)  Stated differently, if the volume of water produced by the "spray rack"

2  testing were excessive, why is it that the leaking windows, once resealed, did not leak when

3  subjected to the same volume of water?  The obvious answer is that the windows leak if

4  improperly sealed and do not leak if properly sealed.

5         Further, Viking asserts that if the windows did not leak during the "spray rack"

6  test, any preexisting staining must have been caused by something other than the windows.  This

7  assertion is incorrect.  Because the "spray rack" test excluded the "pressure chamber test"—the

8  portion of the test designed to mirror wind driven rain—the cause of the staining is most likely

9  attributable to prior incidences of "real life" wind driven rain, a condition not produced by the

10  "spray rack" test.  Thus, evidence of staining on windows that "passed" the "spray rack" test does

11  not lead to the conclusion that the stains were caused by installation deficiencies.  The presence of

12  staining demonstrates that the "spray rack" testing—as expected—failed to mirror wind driven

13  rain, the most probable cause of the stains adjacent to the lower corners of the windows.  (*See*

14  Reply Declaration of Jim Cassell, ¶¶11, 12.)

15         As set forth below, the inevitable conclusion, made possible by Viking's own

16  testing and consistent with the testimony of plaintiff's experts in the *Cartwright* case, is that

17  common issues predominate regarding the defect.  The evidence also confirms an alarmingly high

18  failure rate and the need for class certification.

19  **III.   SUMMARY OF EVIDENCE**

20         Between 1989 and 1999 Viking manufactured the Series 3000 aluminum windows.

21  The windows all were accompanied by representations that they had a lifetime warranty and met

22  important criteria, including the R-20 rating, demonstrating that the windows passed certain tests

23  such as ASTM 1105.  All of the windows were designed and manufactured the same at the lower

24  corners.  The windows are not water tight and will leak in the absence of sealant.  The Viking

25  design specification required sealant to be applied at five seams.  *See* Cassell Decl., ¶27.  Viking

26  did not follow its own specifications and at most applied sealant to three seams.  *See* Wolf Decl.,

27  ¶4.

28

1    The PTI 200 sealant was applied to all Viking Series 3000 windows.  The PTI 200

2  has an intermediate  life expectancy of 10 to 15 years.  The aluminum framing has a life

3  expectancy of 35 to 40 years, thus creating irreconcilable differences between the useful life of

4  the sealant and window frames.  Because of the short life expectancy of the sealant, Viking's

5  representation that these windows would last the life of a home was demonstrably false.

6    The reality is that the Series 3000 windows have failed or are substantially certain

7  to fail before their useful life.  Viking generated a failure rate of 43% using "spray rack" tests on

8  windows.  The windows leaked at the lower corners even though Viking eliminated the "pressure

9  chamber" from its testing protocol, making the test much less rigorous than as required by ASTM

10  1105.  Had the "pressure chamber" been included the failure rate would have been substantially

11  higher.  (*See* Cassell Reply Declaration, ¶¶8, 9)  When the windows that failed the water test were

12  resealed and retested, the windows did not leak—proving both that the volume of water was not

13  excessive and that the leaks were exclusively caused by the defective windows.

14    Viking asserts that homeowners are satisfied with their windows.  However, its

15  survey made no inquiry regarding whether homeowners had ever inspected their windows, nor

16  did Viking inform homeowners of the fact that their windows failed the "spray rack" test.  (*See*

17  Birka-White Reply Declaration, ¶9, Exhibit F, Sullivan Depo. at 210:22-25; 211:1-11.)  Dr.

18  Sullivan acknowledged that he could alter the homeowners' satisfaction simply by changing the

19  manner in which the survey questions were presented.  (*See* Birka-White Reply Declaration, ¶9,

20  Exhibit F, Sullivan Depo. at 211:12-25; 212:1.)  Dr. Sullivan further admitted that the results of

21  the survey have no legal significance.  (*See* Birka-White Reply Declaration, ¶9, Exhibit F,

22  Sullivan Depo. at 92:14-24.)

23    Viking's substandard testing produced a failure rate of 43%, and yet, none of

24  Viking's experts made *any* effort to determine *why* the lower corners were leaking.  Given the

25  dozens of water tests with a high failure rate, any objective expert would seek to address the

26  reason for the failure – particularly when Viking's experts were in a position to make such

27  inquiry simply by observing the sealant and leakage in the lower corners of the windows.  From

28  Plaintiffs' perspective, it was not an accident that this data was not collected.  The defense team

1   scrupulously avoided gathering data regarding the cause of the leak because that data proves the

2   defect.

3              Indeed, the evidence demonstrates that the cause of these leaks is attributable, in

4   virtually every instance, to one of three factors:  either the sealant failed, or the sealant was

5   misapplied, or the sealant was not applied at all.  (*See* Birka-White Reply Declaration, ¶11,

6   Exhibit H, Chamsi Depo. at 94:22-25, 95:1-10.)  These conditions are readily observable and

7   such findings  are easy to gather.  Plaintiffs' experts have identified the defects common to all

8   Viking windows, and clearly demonstrated the mechanism by which these windows fail, and that

9   mechanism is common to all windows at issue in this class action.

10  **IV.   ARGUMENT**

11         **A.   The *Deist* Action Does Not And Should Not Prevent Class Certification Of
               This Action.**
12

13             Viking argues that certification of the *Cartwright* class will only result in

14  relitigation of issues decided by the *Deist* court.  This argument fails for numerous reasons, the

15  most obvious being that the *Deist* court has not decided any issues that would dispose of any of

16  the *Cartwright* claims.

17             The Viking brief begins with the following false statement:  "This action and the

18  *Deist* action are identical as to every essential element. . . . [T]he claims are identical."  (Opp'n

19  Br. 13.)  In fact, the *Deist* class action now involves only two claims:  breach of express warranty

20  and breach of implied warranty.  However, the *Cartwright* action seeks to certify the warranty

21  claims along with six other claims.  The CLRA, UCL, unjust enrichment, fraudulent deception,

22  negligence and strict liability claims involve questions of law and fact that are not even raised by

23  the warranty claims.

24             If the *Cartwright* class is not certified, critical consumer protection claims will not

25  proceed, and class members who do not have viable warranty claims will be denied a remedy

26  available under statutory and common law.  Further, the proposed *Cartwright* class is

27  considerably broader than the *Deist* class, as the proposed *Cartwright* class includes former

28

1    owners as well as current owners who are not original owners, none of whom is covered by the

2    class in *Deist*.

3    Viking goes so far as to argue that this Court should decline to exercise

4    jurisdiction over *Cartwright* while *Deist* proceeds in state court pursuant to *Colorado River*

5    *Conservation District v. United States*, 424 U.S. 800 (1976).  *Colorado River* abstention is

6    entirely inapplicable here.

7    As a preliminary matter, the abstention doctrine is unrelated to Plaintiffs' motion.

8    This is a motion for class certification pursuant to Federal Rule of Civil Procedure 23, not a

9    motion to dismiss.  The *Colorado River* analysis does not inform the Court on whether the class

10   satisfies the requirements of Rule 23.  The proper vehicle for those arguments is a motion to

11   dismiss or a motion to stay.

12   Furthermore, *Colorado River* abstention is only appropriate under exceptional

13   circumstances – and there are no exceptional circumstances here.  *Colorado River* can only apply

14   if the *Deist* action will dispose of all claims raised by *Cartwright*.  "The critical determination is

15   whether the non-federal litigation will dispose of all claims raised in the federal court action. . . .

16   This is true even if the plaintiff in the federal action could have raised the issues in the state court

17   proceeding and chose not to do so."  Moore's Federal Practice 3d, § 122.06[1].   The Ninth

18   Circuit has consistently held that abstention is not appropriate unless the state court action will

19   resolve *every claim* raised in the federal action:

20
21
22
23
>       'When a district court decides to dismiss or stay under *Colorado
>       River*, it presumably concludes that the parallel state-court litigation
>       will be an adequate vehicle for the complete and prompt resolution
>       of the issues between the parties.  If there is any substantial doubt
>       as to this, it would be a serious abuse of discretion to grant the stay
>       or dismissal at all[.]'

24   *Intel v. Advanced Micro Devices, Inc.,* 12 F.3d 908, 913 (9th Cir. 1993) (*quoting Moses H. Cone*

25   *Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 28, 103 S.Ct. 927 (1983)).  *See also Smith v.*

26   *Central Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005).

27   In the present case, there is no possible outcome in the state court that will resolve

28   all the issues raised in the federal action, given the many different claims advanced in *Cartwright*.

1   Moreover, as this Court recognized in its June 19, 2008 Order Denying Viking's Motion for

2   Protective Order, "the proposed class in [ ] this action is different from the proposed class in the

3   *Deist* action[.]" (DE # 51). Here, additionally, putative class members can opt out of *Deist*. In

4   fact, the *Deist* court recently ordered *Deist* counsel to include notice of the *Cartwright* action in

5   the *Deist* class notice.[1] Given these differences, it is clear that *Deist* cannot and will not resolve

6   the issues between the parties in this action, and that abstention is clearly inappropriate.

7         **B.**        **Common Questions Of Law And Fact Predominate Over Individual Issues.**

8                    Viking baldly asserts that individual issues overwhelm "all classes" and "all

9   purported theories of recovery." (Opp'n Br. 16.) Even if Viking correctly identified individual

10  issues, questions common to the class still predominate over individual issues for every segment

11  of the class and for every claim brought by the class. Further, many of the purportedly individual

12  issues raised by Viking are simply inapplicable to the claims at issue here.

13        **1.**        **Individual Issues Of Standing Do Not Bar Class Certification.**

14                   Viking claims that individual questions of standing prevent class certification.

15  (Opp'n Br. 16.) However, absent class members "need not make any individual showing of

16  standing, because the standing issue focuses on whether the plaintiff is properly before the court,

17  not whether represented parties or absent class members are properly before the court."

18  1 H. Newberg & A. Conte, *Newberg on Class Actions* (4th ed. 2002), § 2:7, p.88; *In re General*

19  *Motors Corp. Dex-Cool Prod. Liab. Litig*., 241 F.R.D. 305, 310 (S.D. Ill. 2007) (standing "is

20

21  [1] Due to the significant claims pursued in this action that are not included in *Deist*, and pursuant
    to their obligations under *Trotsky v. Los Angeles Federal Savings and Loan Assoc.*, 48

22  Cal.App.3d 134 (1975), Plaintiffs undertook to have class counsel notify prospective Class
    members in *Deist* of the pendency and characteristics of this action so they can make and

23  informed and reasoned decision concerning whether to remain in the *Deist* class or have the
    claims asserted in this action. On May 18, 2009, the *Deist* court ordered that the class counsel in

24  *Deist* include the following language, in relevant part, in its notice forms:

25           There is another lawsuit pending that asserts claims regarding the Viking windows that are
             the subject of this lawsuit. That action is titled Lynda Cartwright, Lloyd Cartwright, et

26           al. v. Viking Industries, Inc. (Hereafter "Cartwright action") and is pending in the United
             States District Court for the Eastern District of California Case No. S-07-2159 FCD-EFB.

27           The Plaintiff in the Cartwright case seeks to have the matter certified as a class action. . . .
             If the Cartwright case is certified as a class action, you will have the option to opt-out of

             the Deist case and participate in the Cartwright case.

28  *See* Plaintiffs' Request for Judicial Notice In Support of Motion for Class Certification, Ex. A.

1    assessed solely with respect to class representatives, not unnamed members of the class").  *See*

2    *also In re Tobacco Cases II*, 46 Cal.4th 298, 318-19 (Cal. 2009) ("federal case law is clear that

3    the question of standing in class actions involves the standing of the class representative and not

4    the class members").

5             In *Tobacco Cases II*, the California Supreme Court, relying on Federal Rule 23,

6    also held that standing issues at the class certification stage only apply to the class

7    representatives.  Quoting from *Vuyanich v. Republic Nat'l Bank of Dallas*, 82 F.R.D. 420, 428

8    (N.D. Tex. 1979), the Supreme Court stated:

9                    'In a class action, then, the trial court initially must address whether
                 the named plaintiffs have standing under Article III to assert their
10               individual claims. If that initial test is met, the court must then
                 scrutinize the putative class and its representatives to determine
11               whether the relationship between them is such that under the
                 requirements of Rule 23 the named plaintiffs may represent the
12               class. The trial court generally need not address the final question
                 of whether the class itself, after certification, has standing.'
13

14   *Tobacco Cases II, supra*, at 319.

15           Viking did not (and cannot) cite a single opinion on class certification to support

16   its claim.  Instead, Viking offers *Krusi v. S. J. Amoroso Construction Co., Inc.*, 81 Cal. App. 4th

17   995 (2000), and *Vaughn v. Dame Construction Co.*, 223 Cal. App. 3d 144 (1990).  Both are

18   decisions on summary judgment, and both involve construction defect claims brought as

19   individual cases.  As such, they are of no import to this class certification motion and do not

20   speak to the standing requirements of absent class members.

21           **2.       Individual Issues Related To Statutes Of Limitations Do Not Bar Class**
                        **Certification.**
22

23           Viking claims that the class cannot be certified if there are individual issues

24   regarding the statute of limitations.  (Opp'n Br. 17.)  Once again, Viking does not cite a single

25   class certification case to support its claim.  Instead, Viking cites the *Deist* summary judgment

26   order, which held that claims brought by certain representative plaintiffs were barred by the

27   statute of limitations.  Yet the *Deist* court certified a class action, in spite of issues relating to the

28   statute of limitations issues, because the predominant questions go to liability, and are common to

1    all members of the class.  "As long as a sufficient constellation of common issues binds class

2    members together, variations in the sources and application of statutes of limitations will not

3    automatically foreclose class certification."  *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162

4    (3d Cir. 2002).  *See also Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st

5    Cir. 2000) (affirming class certification despite differences in statutes of limitation); *In re*

6    *WorldCom, Inc. Securities Litig.*, 219 F.R.D. 267, 303-04 (S.D.N.Y. 2003).  "Though class

7    members whose claims are shown to fall outside the relevant statute of limitations are barred from

8    recovery, this does not establish that individual issues predominate, particularly in the face of

9    defendants' common scheme of fraudulent concealment."  *In re Monumental Life Ins. Co.,* 365

10   F.3d 408, 420-21 (5th Cir. 2004), *cert. denied sub nom. Am. Nat. Ins. Co. v. Bratcher,* 543 U.S.

11   870, 125 S.Ct. 277, 160 L.Ed.2d 117 (2004); *In re Enron Corp. Securities*, 529 F. Supp. 2d 644,

12   712 (S.D. Tex. 2006)("variations in time bars for some claimants are not sufficient to preclude

13   class certification").  Certification is "not precluded by the need to address individual statute of

14   limitations defenses."  *Grays Harbor Adventist Christian School v. Carrier Corp.*, 242 F.R.D.

15   568, 573 (W.D. Wash. 2007) (*citing Arthur Young & Co. v. U.S. Dist. Court,* 549 F.2d 686, 696

16   (9th Cir. 1977) (approving class certification with adjudication of individual statute of limitations

17   issues after trial)).  A recent case also involving defective windows holds that "[d]ue to the

18   predominance of other issues, differences in applicable statutes of limitations do not bar class

19   certification under Rule 23(e)."  *Saltzman v. Pella Corp.*, No. 1:06-cv-04481, 2009 WL 1637692,

20   at *13 (N.D. Ill., June 4, 2009).

21          The fact is that statutes of limitation are implicated in many class actions, and, if

22   necessary, there are administrative mechanisms available to sort through which claimants are

23   ultimately entitled to a class action recovery.

24                    **3.    Common Questions Predominate For The Fraud, UCL And CLRA**
                              **Claims.**
25

26          Viking argues that these claims cannot be certified because proof of causation

27   requires proof of actual reliance.  However, "California courts have repeatedly held that relief

28   under the UCL is available without individualized proof of deception, reliance and injury."

1   *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1288 (2002) (*citing*

2   *Fletcher v. Security Pacific National Bank*, 23 Cal. 3d 442, 452-453 (1979)); *Committee on*

3   *Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (1983); *Bank of the*

4   *West v. Superior Court*, 2 Cal. 4th 1254, 1266-1267 (1992);  *Prata v. Superior Court*, 91 Cal.

5   App. 4th 1128, 1144 (2001).  Reliance is shown by materiality, which does not require an

6   individual inquiry.  "A misrepresentation is judged to be material if a reasonable man would

7   attach importance to its existence or nonexistence in determining his choice of action in the

8   transaction in question[.]"  *In re Tobacco Cases II*, *supra*, 46 Cal. 4th at 326-27 (internal citation

9   and quotation omitted).  "'That showing will undoubtedly be conclusive as to most of the class.'"

10  *Massachusetts Mutual*, 97 Cal. App. 4th at 1293 (quoting *Blackie v. Barrack*, 524 F.2d 891, 907,

11  n.22 (9th Cir. 1995).  The *Massachusetts Mutual* court held:

12          The fact a defendant may be able to defeat the showing of causation
            as to a few individual class members does not transform the
13          common question into a multitude of individual ones; plaintiffs
            satisfy their burden of showing causation as to each by showing
14          materiality as to all.

15  *Massachusetts Mutual*, 97 Cal. App. 4th at 1293 (*quoting Vasquez v. Superior Court,* 4 Cal. 3d

16  800, 814 (1971) *and citing Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 363 (1976));

17  *see also Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2008)

18  ("Materiality, for CLRA claims, is judged by the effect on a 'reasonable consumer'").  Here,

19  Viking represented on each window that the window would last a lifetime.  That is a material

20  representation by any standard, stamped on each and every window, not to mention all of its

21  brochures and tear sheets, and also demonstrates commonality.

22          Viking claims that there was "no consistent or extensive advertisement" of the

23  window products - *by Viking*.  But Viking misses the point.  Aside from the stickers on every

24  window, Viking created the message that was presented in advertisements paid for by its

25  partners.  That is the purpose of tear sheets, and the message was unchanged for the entire

26  relevant period.  (Keegan Decl., ¶¶20-25.)  Viking also created marketing materials for

27  distribution by Viking's resellers.  (Keegan Decl., ¶22.)  The brochures also delivered the

28  message that the windows would last for the life of the building, although Viking knew the

- 14 -

1   sealant would not perform even half as long as the expected life of a window.  That message was

2   consistently delivered through the marketing materials.  (Keegan Decl., ¶25.)

3          Viking misreads *Meyer v. Sprint Spectrum*, 45 Cal. 4th 634, 641 (2009).  *Meyer*

4   merely holds that "in order to bring a CLRA action, not only must a consumer be exposed to an

5   unlawful practice, but some kind of damage must result."  The *Meyer* court explicitly held that

6   plaintiffs need not allege actual damage.  45 Cal. 4th at 640 ("'any damage' indicates a category

7   that includes, but is greater than, 'actual damages'").  In any event, the Cartwrights have in fact

8   alleged damages, as the windows in their home have failed and will fail and requirement

9   replacement.

10         Viking relies on *Stickrath v. Globalstar, Inc.,* 527 F. Supp. 2d 992 (N.D. Cal.

11  2007), a decision on a motion to dismiss.  In *Stickrath*, the court held that plaintiffs failed to

12  allege that the defendants' misrepresentations were material to the decision to purchase

13  defendants' product.  527 F. Supp. 2d at 996.  *Stickrath* is inapposite here, where the question is

14  not whether plaintiffs have adequately alleged their claim, but whether plaintiffs can prove their

15  claim with evidence that is predominantly common to the class.  The *Stickrath* court does not

16  address whether, if properly alleged, a plaintiff could prove materiality on behalf of a class with

17  common proof.

18         Viking's reliance on *In re Tobacco Cases II,* 46 Cal. 4th 298 (Cal. 2009), is

19  particularly misplaced.  Viking cites *Tobacco Cases II* for the simple proposition that "a plaintiff

20  must plead and prove actual reliance to satisfy the standing requirement of § 17204 . . ."  (Opp'n

21  Br. 22.)  However, as discussed above, *Tobacco Cases II* explicitly held that *only class*

22  *representatives* must satisfy the standing requirement, and therefore only the class representatives

23  had to plead and prove injury.  The Supreme Court reversed the trial court's decertification of the

24  class on precisely these grounds.

25         Furthermore, contrary to Viking's claims, *Tobacco Cases II* did not "confirm[] that

26  an inference of reliance is improper without evidence of 'an extensive and long-term advertising

27  campaign.'"  (Opp'n Br. 22.)  Because the case at issue involved "an extensive and long-term

28  advertising campaign," the California Supreme Court held that the individual plaintiff satisfied

1   the reliance element of standing.  15 Cal. 3d at 328.  The California Supreme Court clearly did

2   not state that such a campaign was required for class representatives to show standing, and

3   certainly not to show actual reliance by or harm to class members.

4            *Osbourne v. Subaru of America, Inc.,* 198 Cal. App. 3d 646 (1988), also lends no

5   support to Viking's argument.  *Osbourne,* which was decided under California's class action rule,

6   not Rule 23, upheld a decision not to certify a nationwide class.  However, the plaintiffs were

7   seeking the application of the laws of all 50 states to their proposed class – laws that varied with

8   respect to key issues in the litigation.   In fact, the lower court's decision, quoted by the appellate

9   court, specifically stated "that individual questions of reliance and damages are not necessarily by

10  themselves sufficient to defeat class treatment." *Id*. at 817.  However, it was the application of

11  the laws of each of the 50 states that lead the Court to conclude that individual issues defeated

12  class certification.  *Id*. at 818.  "[A]s we recently concluded in *Baltimore Football Club [v.*

13  *Superior Court*, 171 Cal. App. 3d 352, 363 (1985)], 'When legal questions vary from state to state

14  and hence require the trial court to make diverse legal ruling on an emerging theory of recovery in

15  a multitude of jurisdictions, the questions of law necessarily would be more individual than

16  common to all.'" *Id*. at 819.  The Cartwright class is decidedly not a nationwide class; indeed, the

17  laws of only a single state, California, will be applicable to all class members.  This is significant,

18  and also helps demonstrate that a class trial will be manageable as only a single state's law will be

19  applicable to all class members.

20           Viking also argues that these claims cannot be certified as omissions claims

21  because omissions claims require either a duty to disclose or an inconsistency with

22  representations made by the defendant.  (Opp'n Br., at 23.)  Viking relies on *Daugherty v.*

23  *American Honda Motor Co., Inc.,* 144 Cal.App.4th 82 (2006).  *Daugherty* is a decision decided

24  on demurrer – not a class certification decision.  The question here is whether the requisite

25  elements of Plaintiffs' claims can be shown with predominantly class proof.  Indeed, affirmative

26  representations are often shown with class proof.

27           The *Daugherty* court's discussion of *Chamberlan v. Ford Motor Company,* 223

28  F.R.D. 524 (N.D. Cal. 2004), is misunderstood by Viking.  *Daugherty* distinguished *Chamberlan*

1  because *Chamberlan* did not address the central issue in *Daugherty* of whether a nondisclosure

2  was actionable under the CLRA.  However, that question was not presented by the class

3  certification motion in front of the *Chamberlan* court.  Like *Chamberlan*, the present motion is

4  also a class certification motion.  The question in front of this Court is whether the CLRA and

5  other claims can be shown with class proof.  *Daugherty* does not inform that issue.

6  Furthermore, contrary to Viking's assertion, the UCL claim does not require

7  privity of contract.  "Indeed, business practices may be found unfair based upon the mere

8  likelihood of public deception, and nothing more."  *See Schwartz v. Visa Intern. Corp.*, No.

9  822404-4, 2003 WL 1870370, at *50 (Cal. Sup. Ct. Apr. 7, 2003) (*citing Bank of the West v.*

10  *Superior Court*, 2 Cal. 4th 1254, 1267 (1992) *and Acree v. General Motors*, 92 Cal. App. 4th 385

11  (2000)).

12  Nor is privity of contract required for CLRA claims.  The CLRA makes unlawful

13  "unfair methods of competition and unfair or deceptive acts or practices undertaken by any

14  person in a transaction intended to result or which results in the sale or lease of goods or services

15  to any consumer." Cal. Civ. Code § 1770(a).  The CLRA is construed liberally to further its goal

16  to protect consumers against unfair and deceptive business practices.  *See* Cal. Civ. Code § 1760.

17  Thus, a CLRA claim is properly alleged against defendants who engaged in a transaction

18  intending to result in the sale of goods to a consumer.  *Keilholtz v. Superior Fireplace Co.*, No. C

19  08-00836 CW, 2009 WL 839076, at *3-*4 (N.D. Cal. Mar. 30, 2009) ("Defendants fail to cite any

20  authority . . . that a CLRA claim can be asserted only against defendants who sell goods or

21  services directly to consumers").

22  Even if privity *were* required for Plaintiffs' claims to prevail—which it is not – the

23  Court in this very case has already found that "[p]laintiffs have sufficiently alleged facts

24  demonstrating that privity exists between Viking and plaintiffs."  *See Cartwright v. Viking*

25  *Industries, Inc.*, 249 F.R.D. 351, 355-56 (E.D. Cal. 2008) (citing *Shell v. Schmidt*, 126 Cal.

26  App.2d 279, 290 (1954); *see also Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal.

27  App. 3d 65, 69 (1978)).  As this Court explained:

28

1

> Under California Civil Code § 1559, a third party beneficiary can
> enforce a contract made expressly for his benefit. A contract made
> expressly for a third party's benefit does not need to specifically
> name the party as the beneficiary; the only requirement is that "the
> party is more than incidentally benefitted by the contract."
> Plaintiffs allege Viking sold the windows to distributors and others
> ("Initial Purchasers") who were not intended to be the ultimate
> consumers of the Window Products. Plaintiffs claim the
> agreements between Viking and the Initial Purchasers were
> intended to benefit the homeowners, including plaintiffs.

2

3

4

5

6

7   *See Viking*, 249 F.R.D. at 355-56 (internal citations and quotations omitted).

8   Similarly, all class members present a valid CLRA claim, including the subsequent

9   purchasers. Each member of the class need not have seen representations made by Viking

10   because the critical question is whether Viking's misrepresentation "intended to result or [did

11   result] in the sale or lease of goods or services to any consumer." Cal Civ. Code § 1770(a). Here,

12   the warranties themselves were intended to facilitate the sale of the windows. Warranties are a

13   tool used by marketers to gain an edge on competitors or to establish equal footing with

14   competitors that offer warranties on similar products. (Keegan Decl., ¶29.) Thus,

15   misrepresentations made to builders, contractors, or previous owners are sufficient to state a

16   CLRA claim, because the misrepresentations were intended to promote the installation of the

17   defective windows in homes now owned by the plaintiffs. *See, e.g., Keilholtz v. Superior*

18   *Fireplace, Co*., C 08-00836 CW, 2009 WL 839076, at *3-*4 (N.D. Cal. Mar. 30, 2009)

19   ("Plaintiffs' allegations that Defendants sold the fireplaces to home builders, who installed them

20   in homes, resulting in their sale to Plaintiffs, is sufficient to allege that Defendants entered into a

21   transaction which was "intended to result or which result[ed] in the sale" of goods to a

22   consumer).[2] This outcome is also consistent with the CLRA's liberal construction, intended

23   to promote the protection of consumers against unfair and deceptive business practices. *Id.* at *3.

---

24   [2] In *McAdams v. Monier, Inc.*, 60 Cal.Rptr.3d 111, 115-119 (Cal. App.3 Dist. 2007), *opinion
deferred pending disposition of a related issue in In Re Tobacco Cases II*, 67 Cal. Rptr. 3d 1 (Cal.

25   2007), the court of appeal reversed the trial court's order denying class certification of a CLRA
claim. The *McAdams* court held:

26

> The trial court centered [its] findings on its view that class members
> received different representations regarding the roof tiles in four

27   > different types of purchase transactions (buying from Monier, or
> from an independent distributor, or from a home builder, or from a

28

*Footnote continued on next page*

### 4.    Common Questions Predominate For The Strict Liability And Negligence Claims.

Viking argues that the nature of consequential damages arising from penetration of water presents individual issues that necessarily preclude class certification.  (Opp'n Br. 20.)  Plaintiffs do not seek damages beyond repair and replacement of the windows.  Thus, there is no need for the "highly individualized" analysis of "damage to personal property such as rugs, furniture, and window treatments."  (Opp'n Br. 20.)  Remaining issues involving individual issues of damages – if there are any – are overwhelmed by the many common questions related to liability. *B.W.I. Custom Kitchen v. Illinois*, 191 Cal. App. 3d 1341 (1987) (holding that individual damage issues "cannot bar class certification").[3]  In another recent windows case, the court held that proving property damage from window failure – even where damages must be proven

---

*Footnote continued from previous page*

    prior homeowner), and therefore individual questions, particularly of liability and reliance, predominated. We disagree.

    We conclude the trial court misperceived the nature of plaintiff's CLRA class action. The class action is based on a single, specific, alleged material misrepresentation: Monier knew but failed to disclose that its color roof tiles would erode to bare concrete long before the life span of the tiles was up. As we shall explain, in this context, class treatment is appropriate. . .

    In short, as *Massachusetts Mutual* noted, plaintiffs may satisfy their burden of " 'showing causation as to each [class member] by showing materiality as to all.' " ( *Massachusetts Mutual, supra*, 97 Cal. App. 4th at p. 1292, 119 Cal.Rptr.2d 190, *quoting Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 907, fn. 22.) . . .

    [T]he alleged material misrepresentation in this case, properly viewed, does not encompass an array of varying transactions and misrepresentations but a single failure to disclose a particular known fact. In this milieu, plaintiff McAdams presents a typical claim based on that single, specific failure to disclose.'

The California Supreme Court granted review of *McAdams* and the opinion is "deferred pending consideration and disposition of a related issue in *In re Tobacco Cases II* [.]"  67 Cal. Rptr. 3d 1 (Cal. 2007).  As noted above, the Court decided *In re Tobacco Cases*, finding that plaintiffs need not show harm suffered by absent class members for purposes of class certification.  Based on *In Re Tobacco Cases II*, it is unlikely that the Court will review *McAdams* independently.

[3] Viking argues that *B.W.I. Kitchens* is not applicable, because the type of damage requiring individual calculation was not property damage.  (Opp'n Br. 20.)  Viking offers no authority in support of this claim, and there is none.

---

- 19 -

1    individually – "does not preclude certification on the issue of liability."  *Saltzman v. Pella Corp.*,

2    *supra* 2009 WL 1637692, at *13.

3            **5.    Common Questions Predominate With Respect To Plaintiffs Warranty**
            **Claims.**
4
                **a.    Claims For Breach Of Warranty Do Not Require An Individual**
5                    **Determination That A Defect Has Manifested.**

6            Viking's argument that Plaintiffs' warranty claims should not be certified on the

7    ground that "individualized evidence will be required to determine manifestation of defect on a

8    window-by-window basis" is also wrong.  (Opp'n Brief, at 24-25.)  That is because a claim for

9    breach of warranty "does not require proof the product has malfunctioned" where the defective

10   product was substantially likely to fail before the end of its expected life.  *See, e.g., Hicks v.*

11   *Kaufman & Broad*, 89 Cal. App. 4th 908, 918 (2001); *Anthony v. General Motors*, 33 Cal. App.

12   3d 699, 702, 704-05 (1973) (holding that it is "unnecessary to produce individualized evidence

13   [of] wheel failure or personal injury or property damages as a result of wheel failure"); *In re Ford*

14   *Motor Co. E-350 Van Products Liability Litigation (No. II)*, No. 03-4558, MDL No. 1687, 2008

15   WL 4126264, at *14 (D. N.J. Sep. 2, 2008) (applying California breach of warranty law in multi-

16   state class action, citing *Hicks* with approval and stating that "[a] California court likely would

17   not find that product malfunction is a necessary element of [plaintiff's] breach of warranty

18   claims.")

19           Notably, Viking has not and cannot cite a single decision denying class

20   certification involving claims for express or implied warranty where the manifestation of the

21   defect invoked individual issues.  The only case it cites, *American Suzuki Motor Corp. v. Superior*

22   *Court*, 37 Cal. App. 4th 1291 (1995), is entirely inapposite.  There, asserting claims for breach of

23   implied warranty, the plaintiffs alleged the design of the Samurai, a sport utility vehicle

24   manufactured by defendant, "'create[d] an unacceptable risk of a deadly roll-over accident when

25   driven under reasonably anticipated and foreseeable driving conditions....'"  *American Suzuki*, 37

26   Cal. App. 4th at 1293.  The court granted defendant's petition for a writ of mandate decertifying

27   the class because there was insufficient evidence of a defect, in that "nearly all" of the vehicles

28   were not involved in rollover accidents.  *Id.* at 1298-99.  As the *Hicks* court recognized, the

1    implied warranty claims in *American Suzuki* "were not decided on the ground a defect must have

2    resulted in the product malfunctioning in order to give rise to a suit for breach of warranty.

3    Rather, they were decided on the ground that since there was no history of the products failing

4    they were not, as a matter of law, defective." *Hicks*, 89 Cal. App. 4th at 923-24.[4]

5              Further, Viking made identical lifetime warranties to all purchasers of the Viking

6    Series 3000 windows post-March 1991, and the windows have already failed or are substantially

7    certain to fail long before the expected useful life of the windows.  Viking's own biased and

8    improper testing produced an alarmingly high failure rate of 43%.  (*See* Birka-White Reply

9    Declaration, ¶7,  Exhibit D, Wolf 30:20-25; Birka-White Reply Declaration, ¶8, Exhibit E,

10   Tsongas 21:21-24; Cassell Declaration in Support of Motion for Class Certification, ¶35.)  Those

11   class members with warranty claims (*i.e.*, the warranty subclass) have common claims which

12   predominate over individual issues.  *Hicks et al. v. Kaufman & Broad Home Corp., et al.*, 89 Cal.

13   App. 4th 908 (2001) (certifying a class for warranty claims).[5]  Presumably for these reasons, the

14   trial court in *Deist* previously certified these claims.  *American Suziki* does not compel a different

15   result here.

16

17

---

18   [4] The Sixth Circuit addressed similar arguments in *Daffin v. Ford Motor Co.*, 458 F.3d 549

19   (6th Cir. 2006), in which it upheld class certification of an express warranty claim against Ford
     based upon allegedly defective throttles.  As the Sixth Circuit explained:

20         Daffin's claim is typical of the class because the class members' theory is that Ford
21         breached its express warranty by providing vehicles with defectively designed throttle
           body assemblies, causing Daffin and other class members to receive vehicles worth less
22         than vehicles that conform to the promises allegedly contained in the warranty agreement.
           . . . The mere fact that Daffin's throttle body assembly stuck, while other class members'
           throttles have not stuck, does not render Daffin atypical.  Daffin and the other class
23         members' claims arise from the same practice (delivery of non-conforming vehicle), the
           same defect (the allegedly defective throttle body assembly), and are based on the same
24         legal theory (breach of express warranty).  Typicality is satisfied *despite the different
           factual circumstances regarding the manifestation* of the accelerator sticking and Ford's
25         attempts to remedy manifested sticking.

26   *Id.* at 552–53 (citations omitted) emphasis supplied).

27   [5] Viking's reliance on *Frieman v. San Rafael Rock Quarry, Inc.*, 116 Cal. App. 4th 29 (2004), to
     distinguish *Hicks*' applicability to class certification on breach of warranty claims is unavailing.

28   *Frieman* did not even involve breach of warranty claims, only nuisance and UCL claims.  *Id.*

**b.**     **Individual Notice Issues Do Not Predominate Over The Common Question Of Viking's Liability.**

Viking also asserts that the question whether Plaintiffs and Class members provided Viking notice of the harm giving rise to their claims for express or implied warranty presents individualized issues that preclude class certification.  (Opp'n Brief at 26.)  This argument is both moot and entirely without support.

First, Viking cites no authority holding that notice cannot be provided on a class wide basis after litigation is initiated.  The 50 year-old case on which Viking relies, *Arata v. Tonegato*, 152 Cal.App.2d 837 (1957), involved physical injuries to the plaintiff and did not involve a class action.6[1]  Importantly, in warranty cases, the Supreme Court of California has excused the notice requirement where the plaintiff is not an immediate party to the sale.  *See Greenman v. Yuba Power Products*, 59 Cal.2d 57, 61-63 (1963).  In addition, notice is not required where the breach of warranty "arises independently of a contract of sale between the parties."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh*, 217 Cal.App.2d 492, 514 (1963) (finding that "even if the plaintiff did not give timely notice of breach of warranty to the manufacturer the cause of action should not be held to have been barred").

As the *Greenman* court explained, "[t]he notice requirement . . . is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt."  *Greenman*, 59 Cal.2d at 61-63.  In essence, the notice requirement "becomes a booby-trap for the unwary.  The injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not occur to him to give notice to one whom he has had no dealings."  *Id.*  Citing to the reasoning of *Greenman*, more recent decisions have reaffirmed this principle.  *See In re HP Inkjet Printer Litig.*, 2006 WL

---

[6] In *Arata v. Tonegato*, 152 Cal. App. 2d 837 (1957), plaintiff exhibited to defendant beauty shop operator a rash on her scalp the day after a dye was applied, but gave no further notice, although she was hospitalized several times, underwent several operations, and claimed partial loss of vision.  The court found that the mere showing of a rash, which might have cleared up, did not give notice of the very large injuries later claimed.  These facts are entirely distinguishable from those of the instant case.

1  563048, at *5 (N.D. Cal. Mar. 07, 2006)  ("[E]ven if Plaintiffs did not give timely notice of

2  breach of express warranty to [Defendant], the claim is not barred" because "Plaintiffs bought

3  their . . . printers from retail sellers" and "[Defendant's] express warranties were not contained in

4  the contract of sale between the Plaintiffs and the retail sellers, but instead were created

5  independently in [Defendant's] brochure"); *see also Metowski v. Traid Corp.*, 28 Cal.App.3d 332,

6  339 (1972) ("statutory demand for notice might be satisfied by proof of complaints from some but

7  not all of the buyers of the product," and relieving remote consumers of an individual notice

8  requirement "might be particularly appropriate where the failure of the merchandise to conform to

9  express warranties was known to or reasonably discoverable by the seller at the time of the

10  sales").

11         Second, Viking's argument is moot because, "[r]egardless, notice otherwise given

12  within a reasonable period of time can under California law follow commencement of suit

13  provided it is subsequently and properly pleaded."  *In re HP Inkjet Printer Litig.*, 2006 WL

14  563048, at *5 (N.D. Cal. Mar. 07, 2006) (quoting *Hampton v. Gebhardt's Chili Powder Co.*, 294

15  F.2d 172, 174 (9th Cir.1961)) (internal quotations omitted).  Moreover, as Viking has

16  acknowledged in its opposition (*see* Opp'n Br. at 26), notice *was* given pursuant to Plaintiffs' pre-

17  suit CLRA notification letter.

18         Finally, whether Plaintiffs and the Class were required to provide notice is a

19  common question.  And even if the answer is not the same for every class member, it is easily

20  decided where each plaintiff falls.  In short, this issue, as with the question of privity, does not

21  predominate over the common question regarding liability if it had to be decided individually.

22  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant

23  adjudication by representation."  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las

24  Vegas Sands, Inc*., 244 F.3d 1152, 1162 (9th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*,

25  521 U.S. 591, 594 (1997)).  "When common questions present a significant aspect of the case and

26  they can be resolved for all members of the class in a single adjudication, there is clear

27  justification for handling the dispute on a representative basis rather than on an individual basis."

28  *Local Joint Exec. Bd.*, 244 F.3d at 1162 (citing *Hanlon*, 150 F.3d at 1022).

1

**c.      This Court Has Already Held That Plaintiffs And The Class Are In Privity With Viking.**

2

3        Viking further contends that privity is lacking between Viking and some class

4   members, namely subsequent purchasers of homes installed with Viking's window products.

5   Viking argues that whether these class members meet the requirements of privity presents

6   individual issues precluding class certification.  (Opp'n Br. at 26-27).  Viking made the same

7   privity argument in its motion to dismiss Plaintiffs' warranty claims.  Denying Viking's motion,

8   this Court recognized that under California Civil Code § 1559, a third party beneficiary can

9   enforce a contract made expressly for his benefit. *Cartwright v. Viking Industries, Inc.*, 249

10  F.R.D. 351, 356 (E.D. Cal. 2008); *see, e.g.,* Cal. Civ. Code § 1559 (2007); *Shell v. Schmidt*, 126

11  Cal. App.2d 279, 290 (1954) ("Where the contract is for the benefit of a class, any member or

12  members of the intended class may enforce it.").  A contract made expressly for a third party's

13  benefit does not need to specifically name the party as the beneficiary; the only requirement is

14  that "the party is more than incidentally benefited by the contract." *See Shell*, 126 Cal. App.2d at

15  290; *see also Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65, 69

16  (1978) (finding that the plaintiff, as the owner of the building, was an intended beneficiary of the

17  contract between the general contractor and the subcontractor).  The Court then held that:

18              [a]ssuming the plaintiffs' allegations are true, plaintiffs have
              sufficiently alleged facts demonstrating that privity exists between
19            Viking and plaintiffs. As alleged, plaintiffs were an intended
              beneficiary of Viking's warranty and thus plaintiffs may bring a
20            claim for enforcement of the implied warranties.

21  *Viking*, 249 F.R.D. at 356 (internal citations omitted); *Atkinson v. Elk Corp. of Texas*, 142 Cal.

22  App. 4th 212, 229 (2006) (manufacturer who expressly warrants its product to ultimate consumer

23  brings itself into privity with that consumer for  implied warranty claims).  Accordingly, contrary

24  to Viking's assertions, privity is not a "particularly problematic" issue (Opp'n Br. at 27), and does

25  not require individualized determinations that would preclude class treatment.  Here, the Court

26  has already determined that homeowners are the intended beneficiaries of Viking windows.

27  Privity therefore is not an issue.  Moreover, as discussed above, the common question of Viking's

28  liability clearly predominate over privity.  *See Anthony*, 33 Cal. App. 3d at 704-5 (1973) (stating

1  that "the gravamen of plaintiffs' case is the contention that *all* wheels of the type involved contain

2  an inherent defect which may cause them to fail at some time . . . It is exactly the sort of common

3  issue for which class actions are designed.")

4  **C.      The Class Representatives Satisfy The Typicality Requirements Of Rule 23.**

5          Viking claims that the class should not be certified because the class

6  representatives do not satisfy the typicality requirement of Rule 23(a)(3).[7] Viking is incorrect for

7  two reasons.  First, the Cartwrights do satisfy the typicality and adequacy requirements.  Second,

8  even if the Cartwrights did not satisfy the typicality requirement for the entire class, additional

9  class representatives could easily be named to meet the requirements of Rule 23.

10          "Typicality is determined by the violation alleged to have occurred." *Andrews*

11  *Farms v. Calcot, Ltd.*,  Slip Copy, 2009 WL 1211374 at *7. (E.D. Cal. 2009);  *Hanon v.*

12  *Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 2002).  "The test of typicality is whether other

13  members have the same or similar injury, whether the action is based on conduct which is not

14  unique to the named plaintiffs, and whether other class members have been injured by the same

15  course of conduct."  *Hanon*, 976 F.2d at 508.

16          The Cartwrights, like every member of this class, allege injury arising from

17  Viking's manufacture and sale of defective windows.  They allege that Viking's sale of the

18  windows was deceptive, in violation of both the CLRA and UCL.  This is more than sufficient to

19  satisfy "the rule's permissive standards[.]" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th

20  Cir. 1988).  "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of

21  absent class members; they need not be substantially identical." *Id.*

22          The Cartwrights are retail purchases of their defective windows.  For this reason

23  only, Viking argues that their claims are not typical of class members who acquired the windows

24  through purchase of a home.   However, the typicality inquiry focuses on the violation – here, the

25  manufacture and sale of defective windows. *Andrews Farms*, *supra*, 2009 WL 1211374 at *7.

26  "In determining whether typicality is met, the focus should be "on the defendants' conduct and

---

[7] Viking also argues that the class representatives do not satisfy the adequacy requirement of Rule
23(a)(4), but the only grounds for their purported inadequacy is that the Cartwrights are not
typical of the class.  (Opp'n Br. 28.)

1   plaintiff's legal theory," not the injury caused to the plaintiff.  *Rosario v. Livaditis*, 963 F.2d

2   1013, 1018 (7th Cir. 1992). Typicality does not require that 'all class members suffer the same

3   injury as the named class representative.'  *Id.*"  *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D.

4   391, 396 (N.D. Cal. 2005) (emphasis added).

5           "Indeed, some degree of individuality is to be expected in all cases. [Citations.]

6   Courts looks to whether class members have similar injuries, 'whether the action is based on

7   conduct which is not unique to the named plaintiffs,' and whether other class members were

8   injured by the same conduct." *Mazza v. American Honda Motor Co.*, 254 F.R.D. 610, 618 (C.D.

9   Cal. 2008) (*quoting Hanon*, *supra*, 976 F.2d at 508.)

10          Here, all class members (including the Cartwrights) have the same injury,

11  regardless of how they acquired the defective windows, and were injured by the same course of

12  conduct by Viking.  The typicality requirement is satisfied.

13      **D.      Class Treatment Is The Superior Method Of Resolution.**

14          **1.      The Parallel *Deist* Action Does Not Defeat Superiority.**

15          Viking argues that class treatment is not superior because the parallel *Deist* action

16  is pending in California state court.  Viking cites no authority for this argument.  The existence of

17  a parallel state court action is not unusual, and does not "alter the desirability of class treatment."

18  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1069 (N.D. Cal.

19  2007) ("courts often certify concurrent FLSA collective actions and UCL class actions at the

20  same time"); *see, e.g., Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 491 (E.D. Cal.

21  2006) (same).

22          As discussed above, *Deist* does not include, and cannot resolve, the claims brought

23  in *Cartwright* under the CLRA or UCL, nor the claims for fraudulent concealment and restitution

24  based on unjust enrichment.  Nor does *Deist* "eliminate[ ] a significant portion of the class

25  proposed in the action," (Opp'n Br. 29), as the overlapping class members is 20 percent or less,

26  all of whom will have additional claims in this *Cartwright* action.  Additionally, class members

27  can opt out of the *Deist* class.

28

1    The fact that *Deist* was filed 30 months before *Cartwright* does not advance

2 Viking's argument, because the *Deist* litigation is hardly farther along than *Cartwright.* Despite a

3 significant head start, the *Deist* class was certified only two months ago and class notice was

4 published only this month.

### 2.    The Proposed Class Action Is Manageable.

6    Viking argues that individual issues related to privity, causation, reliance, statutes

7 of limitations and damages render the proposed class unmanageable.  As explained fully above,

8 these issues are common questions.  To the extent that individual issues may arise regarding

9 statutes of limitations and damages, these issues do not render the class unmanageable.

10    Individual issues related to the statute of limitations are questions of fact that can

11 be easily determined in the administration of a this class action.  7 Alba Conte and Herbert B.

12 Newberg, *Newberg On Class Actions* § 22:55 (4th ed.)  ("Possible differences in the application

13 of a statute of limitations to individual class members, including named plaintiffs, relate to the

14 merits of individual claims and do not preclude certification of a Rule 23(b)(3) class action when

15 the necessary commonality and predominance are otherwise present.").  Whether or not a class

16 member has met the applicable statute is deemed a straightforward question of dates, and is

17 manageable even on an individual basis.  "[T]he mere fact that such concerns may arise and may

18 affect different class members differently does not compel a finding that individual issues

19 predominate over common ones.  As long as a sufficient constellation of common issues binds

20 class members together, variations in the sources and application of statutes of limitations will not

21 automatically foreclose class certification under Rule 23(b)(3)." *Waste Management Holdings,*

22 *Inc. v. Mowbray,* 208 F.3d 288, 296 (1st Cir. 2000) (affirming class certification despite statute of

23 limitation issues).

24    Similarly, individual damage calculations do not render the class unmanageable.

25 "Beginning with the Ninth Circuit's decision in *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.

26 1975), courts in the Ninth Circuit have consistently held that the existence of individualized

27 issues of damages does not automatically preclude class certification."  *In re Live Concert*

28 *Antitrust Litig.*,  247 F.R.D. 98, 133-34 (C.D. Cal. 2007); *see Blackie,* 524 F.2d at 905 ("The

1    amount of damages is invariably an individual question and does not defeat class action

2    treatment"); *Harmsen v. Smith,* 693 F.2d 932, 946 (9th Cir. 1982) (same); *Winkler v. DTE, Inc.,*

3    205 F.R.D. 235, 244 (D. Ariz. 2001) (same); *Wilkinson v. F.B.I.,* 99 F.R.D. 148, 157 (C.D. Cal.

4    1983) (same); *Arthur Young & Co. v. U.S. Dist. Court,* 549 F.2d 686, 696 (9th Cir. 1977) ("We

5    reach this result not because the individual and reserved issues do not appear real as they concern

6    damages suffered by the class members, but because these damage issues do not, as a rule, defeat

7    class certification in cases such as these"); *Alba v. Papa John's USA, Inc.,* 2007 WL 953849, at

8    *13 (C.D. Cal. 2007) (class treatment appropriate "even where the amount of damages must be

9    individually determined").  Here, Plaintiffs do not intend to seek consequential damages other

10   than repair and replacement of the windows.  This will substantially streamline the damages

11   analysis, and ensure that individualized damages issues do not complicate trial, or an

12   administrative mechanism utilized to quantify the value of each class member's claims.

13            Finally, Viking claims that Plaintiffs have the burden of producing a trial plan.  In

14   fact, Plaintiffs only have the burden of showing the requisites of Rule 23 are satisfied, including

15   that class treatment is superior to individual treatment.  Plaintiffs have done that.  The cases cited

16   by Viking are nationwide mass tort classes with complicated choice of law determinations that go

17   to the core of the liability issues.  *See, e.g.*, *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d

18   1180, 1189 (9th Cir. 2001) (involving nationwide class of medical monitoring claims and

19   personal injury claims); *Castano v. American Tobacco Co.,* 84 F.3d 734, 742 (5th Cir. 1996)

20   (nationwide class of "nicotine dependent" persons).  In those cases, a trial plan was necessary to

21   make the plaintiffs' case for class certification.  In stark contrast, the present case involves the

22   law of a single state and there are no personal injury claims.  Common issues predominate as they

23   are largely based on Viking's conduct, and manageability is easily established.

24

25

26

27

28

1   **V.     CONCLUSION**

2           Plaintiffs have met their burden pursuant to Rule 23.  This case is appropriate for

3   class treatment, and plaintiffs respectfully request this Court certify the proposed classes.

4   Dated: July 15, 2009                    Respectfully submitted,

5                                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

6

7                                           By: _____
                                                 Robert J. Nelson
8

9                                           Robert J. Nelson (State Bar No. 132727)
                                            Steve M. Swerdlow (State Bar No. 250344)
10                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                            Embarcadero Center West
11                                          275 Battery Street, 30th Floor
                                            San Francisco, CA  94111 3339
12                                          Telephone:  (415) 956 1000
                                            Facsimile:  (415) 956 1008

13                                          David M. Birka-White (State Bar No. 85721)
                                            BIRKA-WHITE LAW OFFICES
14                                          411 Hartz Avenue, Suite 200
                                            Danville, CA  94526
15                                          Telephone:  (415) 616-9999
                                            Facsimile:  (415) 616-9494
16

17                                          *Attorneys for Plaintiffs*
                                            *Lynda Cartwright and Lloyd Cartwright on Behalf of*
18                                          *Themselves and All Others Similarly Situated*

19

20

21

22

23

24

25

26

27

28